THOMPSON, J.
On the 19th November, 1841, John M. Speed became the accommodation endorser of Jas. E. Horner upon a note of $2,000, negotiable and paj’able at the Farmers Bank of Virginia at Lynch-burg. Horner had the note discounted, and received the proceeds. At maturity it was protested, and Speed had the money to pay, and thus became the creditor of Horner for that amount and the charges of protest.
On the 7th March, 1842, Horner together with Wm. H. Watson, styling themselves merchants and partners, under the firm of Horner & Watson, filed their petition in the United States Court for the Eastern District of Virginia, praying to be decreed and declared bankrupts, upon which such proceedings were had, that on the ISth September, 1842, they were finally discharged from all their debts and liabilities — that to the appellee above-stated included. There was filed with the petition three lists of debts, to wit, of the partnership debts and of the individual debts of each partner. This debt appears on the list of Horner’s individual debts, and though the commissioner in' bankruptcy reports that Horner made affidavit before him that the proceeds of the note were applied to the partnership uses, and thereby became a partnership liability, and though it may be so regarded as between the partners, yet as to Speed it must be regarded as the individual debt of Horner; but whether regarded as the individual debt of Horner, or a social debt, he was equally discharged *from it by the decree of bankruptcy and certificate of discharge — the effect of the proceeding, although upon a joint or partnership petition, béing to discharge both Horner and Watson from all their individual and partnership debts and liabilities, proved or provable under the commission.
According to the pretensions of Sneed, Horner several times after his discharge *863 (without locating the time when) promised to pay the debt as soon as he was able, and recently, before the 5th November, 1849, promised absolutely and unconditionally to pay.
On the 12th January, 1850, Speed brought indebitatus assumpsit, grounding his action on these alleged new promises. The declaration contains two counts, the first relying on the unconditional promises made in the fall of 1849; the second on the promise to pay when able, and averring Horner’s ability to pay.
Horner (defendant in the court below) demurred to the whole declaration for a misjoinder of counts, objecting to the competency of joining upon conditional and unconditional promises in the same declaration, and then demurred to each count separately: to the first, because it did not declare upon the original cause of action, i. e. the note extinguished by the decree in bankruptcy, and to the second, because it did not state in what the defendant’s ability to pay consisted.
The demurrers to the declaration and to each count being overruled by the court, the defendant pleaded non-assumpsit and non-assumpsit within five years, and, on these pleas, issues were severally joined. He then tendered four pleas, (in addition to the pleas of non-assumpsit and non-as-sumpsit within five years, on which issue had been joined,) numbered in the record 3, 4, 5 and 6, all of which the court rejected, and for which rejection he took several bills of exception.
No. 3 is a plea of the act of limitations in a special form, relying, upon the lapse of time (more than five years) between the discharge in bankruptcy and the bringing of this suit, and denying that any new promise *or any acknowledgment was made in the form (to wit in writing) necessary to re-bind a party protected by the Tenterden act of limitations, enacted in England in 1826, and in Virginia in 1828. I state the substance, not the language or a literal transcript of the plea.
No. 4 relies upon the same statute of limitations, as applicable to the time elapsed since the accrual of the original cause of action, and between that time and the institution of this suit.
No. 5 is simply a plea of discharge in bankruptcy to a deblaration, alleging and counting upon new promises or assumpsits since the discharge.
No. 6, though differing in form, is in substance and legal effect the same as No. 4, being nothing more than the plea of the statute of limitations, (without indicating any- reference to the Tenterden act,) to the promissory note, which was the foundation of the original cause of action, oyer of which was craved and granted, though not according to the strict forms of pleading demandable, as appears from the introductory part of the plea.
After the demurrers were overruled and the four additional pleas tendered were rejected, the cause came on for trial, and a jury was impanneled and sworn to try the issues joined upon the pleas of non-assump-sit and non-assumpsit within live years. The plaintiff’s evidence being heard, and none offered on the part of the defendant, he demurred thereto, and there was a joinder in the demurrer: whereupon the jury returned a verdict for the plaintiff for $2,000, with interest from the 4th of February, 1842, subject to the opinion of the court upon the demurrer, and the court gave judgment for the damages ascertained by the verdict upon the demurrer to evidence.
This judgment is brought up for examination and review by supersedeas awarded upon a petition assigning errors in the rulings of the court below, in overruling the demurrers to the declaration and the several counts, in rejecting the four special pleas before mentioned, and *in overruling the defendant’s demurrer to the plaintiff’s evidence. The demurrers to the declaration for a misjoinder of counts and to the second count, because it did not aver in what the defendant’s ability to pay consisted, are so manifestly untenable, as to render it unnecessary to bestow on them a moment’s consideration; for if not expressly abandoned and surrendered by the counsel of the plaintiff in error, they were not insisted on in argument. Very little was said by the counsel (and that little with no seeming confidence in the point) in support of the demurrer to the first count, because it did not declare on the original cause of action — i. e. a cause of action discharged and extinguished by a decree and certificate of discharge in bankruptcy. Indeed, they seemed to surrender it, by not seriously insisting on it. If insisted on it could not be sustained either on principle or authority. Inasmuch as the new promise constitutes the cause of action, the old debt being only the consideration to support the promise, if it were a new question, it would, upon principle and upon the theory of actions, seem very clear that the plaintiff would be compelled to count upon the new promise as the real cause of action; and assimilating this to the new promise to pay a debt barred by-the statute of limitations, the case of Butcher v. Hixton, 4 Leigh, 519, and Bell v. Morrison, 1 Peters, 371, and others that might be cited, would be authority for holding that the creditor must declare on the new promise. But the authorities, ancient and modern, English and American, with but few exceptions, have otherwise settled the question, and according to Parsons, in his treatise on Contracts, new edition, 1855, vol. I. pp. 308-9, have held, “that where a new promise is made, it does not seem to be necessary to declare upon it as the foundation of a suit, but an action may be brought upon the old promise, and the new promise will have the effect of doing away the obstruction otherwise interposed by the bankruptcy and discharge. Bxtt if the new promise be conditional, then *the party seeking to enforce it *864 must show the condition satisfied. In such case, and perhaps in all, it would be' safer to rely upon .the new promise as the ground of the action, and upon the old promise as the consideration for the new one —as in many cases it has been held that the new promise does not revive the negotiability of a bill or note, but binds the insolvent only to the person to whom the contract was made. The contrary has, however, been decided.” Thus it seems the plain tiff may, at his election, sue either upon the new promise or the old, nor is it very apparent which is the more eligible form of declaring, though Judge Parsons seems to consider it the better course to count upon the new promise. Upon the hypothesis that the defendant will not rely upon his discharge in bankruptcy, declaring upon the old promise is the most simple and concise form of proceeding. Upon the opposite hypothesis, the only difference is, that by declaring on the old promise the discharge in bankruptcy and the new promise are brought out in the plea and replication, whilst by declaring on the new they are brought out in the declaration and the plea, and thus the issue by one stage or process of pleading the sooner ended. For the same reason, then, that it has been held the more eligible form of declaring on a bond and collateral conditions, is to set out the condition and assign breaches in the declaration, and to declare on the bond as a single obligation and assign breaches in the replication, it may be held that it is better to declare on the new promise wherever the defendant could rely upon his discharge in bankruptcy. These really seem to me to be the only considerations that are involved in the question as to which is the more eligible form of declaring. Por I think it incontestible, that whichever of the two forms be adopted, the plaintiff’s rights are neither enlarged nor diminished, nor the rights of the defendant, to make defence, in anywise impaired or circumscribed.
As to the rejected pleas 3, 4, 5 and 6, 3 and 4 are the only .ones the materiality of which have been seriously *relied on in the arguments at the bar. The immateriality and irrelevancy of number 5, which is simply a plea of discharge in bankruptcy to a declaration upon a new promise after the discharge, is admitted and the plea surrendered. Number 6 is in substance and effect but the repetition of number 4. So that 3 and 4 are the only ones that need be noticed and commented on. Both rely upon the protection of the statute of limitations — number 3 from the date of the discharge in bankruptcy, number 4 from an anterior period, to wit: the date of the accrual of the original cause of action. Of the two, number 3 appears to me to be much the more plausible, although the counsel seem to rely with most confidence upon number 4. But to hold the statute applicable in either aspect is, in my apprehension, if not an absurdity, a specious fallacy. _ To date its commencement to run, at any time anterior to the discharge in bankruptcy, i. e. the date of the accrual of the original cause of action, as in plea number 4, would be to hold, that, notwithstanding a judgment and recovery, or, what is tantamount, the decree.in bankruptcy making the justice and validity of the debt res adjudicata, the statute still continued to run against the original cause of action. To state such a proposition, it seems to me, is to refute it. No matter if the cause of action had been doubly or trebly barred by the act of limitations before the suing out of the commission of bankruptcy, if not relied on in that proceeding, and the claim, though stale, is reported and established by the decrees and proceedings in bankruptcy, its validity and vitality is as fully and completely restored and established, so far as respects the operation of the statute of limitations, as if it had been a judgment in a court of law upon a recent cause of action unaffected by the bar of the statute.
Nor can I understand how the statute can commence running after the bankruptcy and before the new promise, as assumed in plea number 3, against the holder of an extinguished cause of action, one ^constituting no longer a legal, but only a moral obligation, binding only in fero conscientias, unless and until rehabilitated by a new promise. I agree with the counsel of the defendant in error, that there is no statute of limitations against a moral obligation. Our statute of limitations provides for the various cases of simple contracts, specialties, judgments, &c.', &c.; but neither in letter nor in spirit do they make any provision for the case of a debt discharged by bankruptcy, as it would have been a work of supererogation, if not an absurdity, to pass an act of limitations against a claim extinguished by bankruptcy. It is enough to enact a statute of limitations applicable to the new promise, and it certainly never could have been intended to enact one to disable the discharged bankrupt from making a valid new promise founded upon the old consideration, however antiquated. No matter which theory of the policy of the statute of limitations we adopt — the ancient, which regarded it as the enactment into statutory form of a positive presumption of payment, subject to be rebutted by proof or admissions of non-payment — or as a p«sitive and absolute bar, irrespective of the original validity of the claim and non-payment, interposed between the plaintiffs and the recovery of a just demand, and founded in the policy of discouraging laches and stimulating diligence in the assertion of rights; the application of the statute of limitations to such a case as this is alike repudiated. There can be no presumption of pay'ment before and against the new promise; there can be no laches or default imputed or imputable to a plaintiff for failing to sue upon an extinguished cause of action.
But it has been argued, that the plaintiff might have sued after the discharge in bankruptcy and before the new prom *865 ise, and that, too, upon the original cause of action, and if so, there is nothing in any of the exceptions of the statute of limitations to prevent him from relying on the statute as well as *the discharge in bankruptcy, and that by declaring upon the new promise he cannot be deprived of this double bar. Might have sued! In precisely the same sense may it be said, that a remainder-man might have sued before the death of the life-tenant — that a party might have sued for the recovery of a debt, the payment of which was injoined, or that, as in the case stated in Bowles’ ex’or v. Elmore’s adm’x, 7 Grat. 385, the plaintiff might have sued on the promissory note, whilst remaining in pledge as an indemnity against the undertaking- of bail, or in any case where the party might have sued before the cause of action accrued or after it had been suspended or discharged, and therefore that the statute of limitations would run against the remainder-man before the death of the life-tenant — against the party who might have sued pending the injunction before the dissolution of the injunction — against the plaintiff in the case of Bowles v. Elmore before the liability of bail was discharged, and against all persons who might have sued before their cause of action accrued, or after a cause of action suspended or discharged and before the renewal of the suspension or discharge as last supposed. The proper question, then, by which to test the application of the statute, by reason of the ability of the party to sue and his failure to sue, is not whether he might have sued in the sense of the argument of the counsel — that is, might have brought an unsuccessful action when and before he had any right to sue — but whether his cause of action had accrued a.nd had not been discharged or suspended, so that at the time his action would not have been premature and groundless, and so that it was incumbent upon him to sue in order to prevent or arrest the running of the statute of limitations against him.
But, in support -of the pretension of the right to rely upon the double bar of bankruptcy and the statute of limitations at the same time, it has been asked if the defendant, whether sued upon the original cause *of action on the new promise, would be precluded from relying upon offset, gaming, usury, or any other plea to the action, impeaching the original validity or legality of the consideration, or alleging-matter of discharge after the decree of bankruptcy, before the new promise as well as after the new promise. I answer, certainly not: and if not, it was then asked, why not be allowed to rely upon the statute of limitations as well as offset, usury, or gaming, and the like. The answer is patent and obvious, and it is this: The only effect of the new promise is to remove the obstruction interposed by the certificate of discharge, and to place the demand in the same plight and condition as the decree of bankruptcy left it without the discharge — a demand established by the adjudication or decree of a court of justice. The new promise could not purge it of any inherent vice or illegality in the original consideration, nor preclude the party from any de-fences, except such as he might be concluded from making by force of the decree ascribing to it the force, operation and effect of a judgment. But the new promise, after the discharge, made in such form as to put out of the way the discharge in bankruptcy, imparts to the old a new legal existence and validity, and makes it a new cause of action brought into existence by the promise, and dependent upon the old only so far as it is necessary to shew a consideration for the new promise and cause of action. If so, what boots it how long this old cause of action, and the moral consideration based upon it, have lain in abeyance? It depended upon the election and free will of the discharged bankrupt whether to revive, re-animate and give to it a legal entity or not; and having done so, it is precisely the same thing, so far as the statute of limitations is concerned, as if the new promise were founded upon a new consideration, springing into existence and passing at the time of the promise.
One (if not all) of the counsel of the plaintiff in *error, by way of illustrating his views of the right of the bankrupt to rely upon this double bar, supposed the case of an infant bankrupt making a new promise after his discharge, and put the question whether the infant would be precluded from relying on infancy as well as bankruptcy. I might answer it by saying, if indeed it be a supposable case, that it might well be considered as falling in the category of the defence of usury, gaming, &c., which I have admitted would not be precluded by the new promise. But if not, and it were conceded that infants are embraced within the purview of the j bankrupt acts, (about which, in the absence of information on that subject, I express ; no opinion, but doubt,) I should say, that the infant bankrupt making a new promise, whilst sdll an infant, might rely upon infancy as well as bankruptcy, and the plea would be an answer as well to the new promise as the old; but supposing him subject to the bankrupt law while an infant, and having made a new promise after his discharge, and when adult, in such form as to make the promise obligatory upon an adult bankrupt, I should say the plea of infancy would not avail him — but if it would, it would furnish no more analogy to the statute of limitations than the defence of usury, gaming, &c. &c.
The question we have been discussing could never arise or would be of no importance where the same sort of promise would avail to remove the bar of infancy, the stature of limitations and bankruptcy; and as the English Parliament almost contemporaneously passed acts requiring promises in writing, (theretofore verbal promises being sufficient,) the English adjudications ¡ therefore furnish us with no precedents. *866 and the question doubtless never would have arisen here but for the accidental omissions in our Legislature to enact- the 6th George IV- — accidental I presume it was, and doubtless owing to the fact that when we followed the example of England in enacting the Tenterden act and the aot requiring the promise to bind for contracts ; - ■ ^entered into in infancy to be in writing, there was no bankrupt law in existence, and when one was enacted, in 1841, it expired after so brief an existence as that the attention of the Legislature was not called to the importance ánd necessity of throwing around the discharged bankrupt the protection given him by the 6th George IV, passed in 1826, two years before the Tenterden act of limitations. The object of the rejected pleas is, by a reliance upon our statute of limitations of 1838, to accomplish that protection which the English statute of 6 Geo. IV gives to a discharged bankrupt, but which our laws have omitted to give. Eor the reasons which I have assigned, I do not think it admissible, and therefore that the court below properly rejected pleas Nos. 3, 4, 5, 6— and this disposes of all the questions arising and reserved in the court below upon the form and sufficiency of the. pleadings.
But much the most important as well as most difficult question remains to be considered — that arising upon the demurrer to evidence, which involves the merits of the controversy: Was the evidence adduced by the plaintiff sufficient to sustain, on his part, the issue joined on either of the counts of the declaration? Did it sustain the averment of a legally binding unconditional promise to paj' the debt discharged by bankruptcy, or a conditional promise with sufficient proof of the averment of ability to pay?
The old debt or original cause of action, the discharge in bankruptcy, the ability to pay, (if that consists in having sufficient estate to pay, although the enforcement of payment by judgment and execution would well nigh absorb it and almost reduce the debtor to second bankruptcy,) are satisfactorily proved by the evidence set forth in the demurrer. There is nothing in the point suggested of variance between the record of bankruptcy and discharge recited in the declaration and that produced in evidence. Nor in the suggestion, for it was but a suggestion, that the statute of limitations barred the new promises; because the evidence of *Mr. Roane, the only witness as to the new promises, did not locate their date with sufficient precision so as to show that they were not made within five years before -the commencement of the suit. As to the unconditional promise, if made, according to Horner’s admission to the-witness, it was made recently before the date of their conversation on the Sth November, 1849, and by force of the expression recently, and : inevitable implication, must have been ■ within five years. And as to the condi- ; tional promise, the statute would not begin < ; to run before ability to pay — and, from the - evidence in the cause, that could not be imputed to Horner anterior to a period much short of five years before the com- ■ mencement of the suit. Indeed, the main defence to the count upon the conditional promise, upon the hypothesis that it was made and is proved, is, that Horner has never j’et become able to pay, within the purview and legal contemplation of such a condition. The only question, then, for consideration and discussion, upon the demurrer to evidence, is the sufficiency' of the evidence to establish a new and binding promise on the part of Horner, whether conditional or unconditional, to pay the old debt. At common law, which is our law, (as we have no such statute as that of 6 George IV, requiring a written promise,) a verbal promise will do, if it be of such a character, so express, distinct, unqualified and unequivocal, as to show that the prom-iser intended deliberately to waive the protection of his discharge in bankruptcy' and to re-bind himself legally to pay the old debt.
According to the early decisions, promises to pay debts barred by the statute of limitations and certificate of bankruptcy were placed in the same category, and very slight, vague and indefinite promises were held sufficient to revive both. According to the modern decisions, a very different rule prevails as to both, as appears by the authorities cited at the bar and. the bench, which it is unnecessary I should recite.
And a most obvious and rational distinction taken between the *two in modern decisions is, that the promise to revive a debt barred by limitation may be implied by law from the acknowledgment of the original justice and validity and continued existence and non-payment of the debt; whilst in case of bankruptcy there can be no promise implied from the ac- ‘ knowledged justice and non-payment of the debt; for, to hold otherwise would be nothing short of a gross absurdity. The promise must be express, in contradistinction to a promise implied by law — payment of interest or part of principal will not do, though held sufficient by the early decisions ; and hence, if there be any difference in the fullness, clearness, distinctness and positiveness of the promises to revive either class of old debts, I think those modern decisions which have held that promises to revive a debt discharged by bankruptcy, should be the more express, distinct, unqualified and unequivocal, are based upon sound reason and solid distinctions.
Having thus cursorily glanced at the character of the evidence necessary to support a new promise, whether conditional or unconditional, the question recurs, Is the evidence in this case sufficient to support either count upon demurrer to evidence?
: ■ ; < Preliminary to the consideration of this question, a correct understanding of the legitimate functions of the court in dealing with such a question is obviously necessary and proper. The effect of such a demurrer is certainly not to substitute a court for a *867 jury to pass upon disputed facts, conflicting- evidence and the weight and credit of evidence; but, in accordance with the maxim ad questionis juris respondent judices, to declare the inference of law upon the facts proved, in like manner as it does in a demurrer in law or to the declaration upon the facts stated or averred. Hence, according to the English practice, the de-murrant is required to withdraw all his own testimony, admit the credibility of his adversary’s witnesses, and admit upon the record all the facts proved by direct evidence and all the facts when it conduces to prove, or may be reasonably *inferred, if it be circumstantial; and I presume, in the event of a disagreement between the demurrant and demurree as to what facts are proved or might be reasonably inferred, it would devolve on the court to decide between them, and settle the fact before compelling a joinder in demurrer. Our practice, sanctioned and established by repeated adjudications, is different from the English in form, and in form only — as it is said — and leading to the same result. With us the evidence on both sides is inserted in the demurrer, and the court, by a retrospective process, when it comes to pass upon the demurrer, is to consider all the demurrant’s evidence in conflict with that of the demurree withdrawn, the credibility of his witnesses admitted, and all the facts admitted, which the demurree’s evidence thus considered proves, or conduces to prove, or which may be reasonably inferred from his whole evidence, both direct and circumstantial ; and in drawing inferences as to what the evidence, whether direct or circumstantial and presumptive, conduces to prove, if the evidence be susceptible of several, differing in degrees of probability, it is incumbent upon the court to adopt those most favorable to the demurree, provided they be not forced, strained or manifestly repugnant to reason. It is not unworthy of remark, in this connection, that this case is altered in form less by our departure from the English than most cases which arise, for here the only evidence -offered was that of the demurree.
We are now, by that retrospective process, to consider and ascertain, according to our judgments, what facts it proves, or conduces to prove, and to declare whether the law arising thereupon be for the de-murrant or demurree. If we think the evidence sufficient, we must affirm the judgment of the court below overruling the demurrer; if insufficient, we must reverse, and sustain the demurrer, unless of opinion, although we deem the evidence insufficient, that nevertheless a jury might have been warranted, without straining the evidence and ^drawing manifestly inconsequential inferences from it, in coming to a different conclusion.
The decision in this case turns upon the evidence of a single witness, and he not a witness to the promise alleged to have been made by Horner to Speed, but to Horner’s admission that he made it in a casual conversation, which occurred between them at an accidental meeting in the streets of Eynchburg, on the 5th November, 1849. The entire and perfect credibility of the witness is conceded by the demurrer to evidence ; and the counsel on both sides have done no more than to pay a just tribute to his memory, (he having died since he deposed, ) by admitting that this inference of law accords with the fact, and that his character for honor, integrity and truth, while living, was unimpeached and unimpeachable — a tribute which, from my acquaintance with the witness as a practising attorney in one of the courts of my circuit, I knew to be well merited. But however upright and faith-worthy the witness, it must be borne in mind that he was deposing as to confessions, a species of evidence that must be received with great caution, no matter how pure the source from which we derive them, because of the liability of mistaking or misunderstanding the admission when made, and of misremembering or misreporting it afterwards. He tells us himself that, in consequence of the relation he bore to the parties and the subject, his warm friendship for Mr. Speed, his having conversed with him on the subject, he at one time distrusted the accuracy of his memory, and was apprehensive lest he should confound his conversations with Speed with those had with Horner. And it is most apparent that there are discrepancies in his examination in chief and cross-examination, however immaterial they may be considered, that betray inaccuracy or confusion of memory. Besides, he does not profess to tell us in his statement E E, which must be taken as his evidence in chief, though it would have been inadmissible for that purpose if objected to on the ’’Trial, that Horner told him all that passed between him and Speed on the occasion when the promise was made, nor all that Horner told him, nor the language, so far as he professed to tell what he said, but only the substance, and not the substance as originally written down by himself on the day of the conversation, but the substance only of the first memorandum — in other words, the substance of the substance of the admission or first conversation, with alterations and amendments. Now as the copy, or copy of a copy, of a written instrument is the less reliable by every remove from the original, how much more unreliable must the testimony in this case be to prove what passed between Horner and Speed, than would have been the evidence of witnesses or this witness to the conversation itself. They could have told us better than the fragment of the conversation thus reported can, whether Horner intended to bind himself, and whether Speed understood him as so intending. It was doubtless under the influence of considerations like these, growing out of the inherent or intrinsic weakness of evidence of this kind, that the Supreme Court of Mississippi held, in the case of Prewett v. Caruthers, 12 Sm. & Mar. 492, "that *868 loose declarations made by the bankrupt to third persons, with reference to his having promised to pay the debt to his creditor, will not be sufficient to establish a promise —they afford some ground for a presumption that a promise has been made to the creditor, but of themselves they do not amount toa promise.” If this case may not be considered as authority to the extent of denying the competency of such evidence standing alone to establish the new promise, it is certainly entitled to grave consideration, as an emphatic declaration of judicial opinion as to the intrinsic weakness and inconclusive character of such evidence to establish such a promise, without the aid of other testimony, and for that purpose I cite it.
The witness, in statement R R, represents Horner as saying, “that since taking the benefit of the bankrupt *law of the United States, he had several times promised to pay the debt as soon as he was able, and he always intended to pa3 said debt to Mr. Speed. He (Mr. Horner) further stated, that he had recently had a conversation with Mr. Speed on the subject of this debt, and in that conversation he had promised Mr. Speed to pay him the said debt. This promise was a verbal promise, and that he refused to give him his bond for the'debt, on account of a promise which he (Horner) had'made his father-in-law Mr. Watson, (who had started him again in life,) that he would not give his bond for any of his old debts; but, for this promise to his father-in-law, Mr. Watson, he said he would have been willing to give his bond to Mr. Speed for the said debt at the time of the said conversation and promise to pay it as aforesaid. He also expressed his wish and great anxiety to pay said debt, and his deep regret that a friend he so much valued as Mr. Speed should lose by him.”
This is said by the counsel of Mr. Speed to include both a conditional and unconditional promise to pay' — the first at an earlier and the last at a more recent period. As proof of its ambiguity and susceptibilitj of different constructions if taken literally, and without reference to its whole context, it is worthy of remark, that whilst Judge Field, in his opinion, considers it a sufficient proof of an unconditional promise, he yet holds that it is insufficient to establish the conditional, because not made to Speed. I differ with him, and agree with Judge Tyler, that if it be sufficient to establish any promise, according to its true grammatical construction, it is conditional throughout; for it seems to me the presumption is inevitable, that the conditional promise was made to Sp'e'ed, if to any one, and the fair construction of ■ the language is, that the same condition was attached to what is called the unconditional promise, by the context and necessary grammatical construction of the sentence. But it is said this' difficulty or ambiguity is removed by the answer of the witness to the 38th question upon- the' cross-examination, in ’'’which he says Horner annexed no condition to this promise; yet, in answer to the ISth question, he states, as one of the reasons why he determined to communicate to Speed what Horner had told him, ‘ ‘his belief that Horner could not be made to pay said debt unless he was able.”
In statement R R, Horner is represented as assigning as a reason for his refusal to give his bond, a promise to his father-in-law, “that he would not give his bond for any of his old debts,” whilst, in his answer to the 6th question of, the defendant, the excuse assigned for the refusal is a promise to his father-in-law, “that he would not bind himself to pay any of his old debts”— again, in answer to the 18th question, “that he would not bind himself to pay any of his old debts.” In another place, he says his opinion was, that a verbal promise was not binding; does not remember whether he so told Horner, but thinks it probable from the fact that such was his opinion. In answer to the 10th question he says, “Mr. Horner did not tell me so expressly,” (that is, that he would come under no obligation to pay,) “but I thought such was his intention, and that if he had known that a promise to pay said debt would have bound him in law to pay it, I do not think he would have made said promise in any shape or form.” In answer to the 12th question, he says, “I cannot recollect what I said, or what Mr. Horner said on the occasion, about binding himself; lean only state that I drew the impression from what was said, that Mr. Horner did not intend to come under any written obligation to pay said note.” To explain or obviate the effect of these inconsistent and conflicting statements of the witness in statement R R, and the cross-examination, he is reexamined by the plaintiff, and in answer to questions 36, 37, 38 and 40, he states the opinion he had expressed that Horner did not intend to bind himself, was conjectural --“my principal reason on which I founded my belief was Horner’s unwillingness to come under any written obligation to pay said debt. ” He *also re-affirms his belief, that statement R R contains a correct and substantial narrative of what took place between Horner and himself on the occasion referred to; that there was no condition annexed to the recent promise of Horner to pay mentioned in statement R R, and that when he used the language in his answers to the 6th and 18th questions, (“that he would not bind himself to pay any of his old debts,”) he meant and designed to be understood that he would not give his bond for any of his old debts.
Statement R R, thus re-affirmed, and the inconsistent statements in the cross-examinations thus explained, it is insisted, would sufficiently support and establish the promises in one or both counts, and more especially the count upon the unconditional promise, if the court were passing upon the case as a jury, and, a fortiori, is it sufficient upon a demurrer to evidence in the decision *869 of which it is insisted that we must regard only statement E K, as explained and reaffirmed, and disregard all the contradictory statements elicited by the cross-examination, as if it were the independent, conflicting evidence of the demurrant. To this proposition I cannot consent. The evidence brought out in cross-examination, explanatory or relative to the evidence in chief of the witness, is as much the evidence of the party calling the witness as the examination in chief. And more especially and emphatically so in this case, wherein the only really legitimate evidence given by the witness — that is, upon his present recollection at the time of trial— was that given on the cross-examination ; his evidence in chief being a prepared statement, not admissible at all as evidence, had it been objected to. Now, it does appear to me, that in a case like this, where the effect is to charge Horner upon the testimony of a witness as to his admission in a casual conversation — a witness 1 admit above suspicion upon the score of integrity and truth, yet a witness who does not profess to give you the whole conversation, and only the substance of the substance of that which he does *give, and a witness whose memory is confessedly confused, inaccurate and fluctuating — nay, more, a witness who testifies that he did not believe Horner intended to bind himself — it is asking too much of the court, to call upon us to say that he intended to bind himself. But it is said he may have made the promise without thinking that it would bind, or without intending to bind himself, and that even though Speed may have believed that a verbal promise would not bind, and did not receive it as such, yet, as there was a moral obligation to pay —ail unqualified promise to pay, which -would be in furtherance of natural justice— an unqualified promise to pay, even though Speed and Horner were both ignorant at the time of its legally binding force, would bind upon the maxim of ignorantia legis excusat neminem, and they say this was an unqualified and unconditional promise to pay according to statement E E, as explained in the cross-examination. I do not understand them as contending, that if the promise had been qualified by the excuse that Horner, in consequence of the promise made to his father-in-law, would not bind himself for any of his old debts, that either the conditional or unconditional promises would have legally bound him — but the argument is, that the refusal was only to give his bond, and it is said, so far from weakening or qualifying, strengthens the promise, and demonstrates that the refusal was grounded on an objection to the form of the security, and not to binding himself by a verbal promise to paj, or binding himself to pay at all — and, by way of illustration, the familiar case is stated of a merchant sending his clerk to his customer to settle or collect his account, and the customer acknowledging the justice of the account and promising to pay, but refuses to close it by bond or note, and a suit is brought upon the account, and it is asked if the acknowledgment and promise would not establish the demand and secure a recovery — I answer most certainly ; but not_by force of the promise. From the acknowledgment of the justice of the account, the *law would imply the promise to pay, even though the customer, whilst admitting the correctness of the account, instead of promising payment, had said he never meant to pay. It is most apparent, then, that the distinction between the case supposed and similar cases put by the same codSsel, and the case of.a-. discharged bankrupt, rebinding himself, is as broad as the ecliptic. The law will not imply a promise by a certificated bankrupt to pay. If it would, it would amount to a virtual repeal of the bankrupt law; it would, indeed, be keeping the word of promise to the sense and breaking it to the hopes; and if loose declarations of an intention to pa3 when able, or what, for want of a better term, I call voluntary promises to pay, not intended by the bankrupt or his creditor to impart a legally binding promise to pay, were to be held valid and binding promises, I venture to say there never was a bankrupt who had not bound himself, without intending it, on some occasion, if the creditor could get at the evidence to prove it. What so natural as for an honest bankrupt to feel the force of the moral obligation to pay a just debt, and to declare his purpose and intention to pay when able, or for a dishonest one to dissemble such a feeling or feign such a purpose or intent? Can it be the policy of the law to discourage such feeling, purpose and intent, nay, kind and friendly feelings and unreserved intercourse between the bankrupt and the creditor, as it certainly would, if the expression of such feelings, purposes and intentions, exposed him to the peril of having his loose, voluntary declarations seized upon and made the ground work of a legal action? Whatever may be our individual opinion as to the justice or expedienc3' of a bankrupt law, however confidential and stringent the nature of the original cause of action, they are considerations outside of the question, and can have not the slightest influence upon its decision.
But to return from this digression, let us suppose it to be the duty of the court, in passing upon the *demurrer to evidence, to discard from its consideration all the statements of the witness brought out in his answers upon the cross-examination in conflict with statement E E, and to take that statement, as explained by the witness upon his re-examination b}' the plaintiff, as the basis of our judgment. Is that sufficient to establish a legally binding contract, either conditional or unconditional, against Horner? If, instead of the language imputed to Horner in statement E E and the explanations of the witness in refusing to give his bond and in his assignment of reasons for the refusal, he had *870 qualified the promise by a refusal to become bound for any of his old debts, or had excused his refusal to give a-bond by reference to a promise made to his father-in-law that he would not bind himself to pay any Of his old debts, I think I may assume it as a concession that it would not be a legal binding promise. And why? Because in the same breath that he promises he refuses to be legally bound by the promise, and negatives the idea that it is anything more than one of those voluntary declarations of a future, intent and purpose to pay, not intended to lay the party under any legal obligation, so frequently made by discharged bankrupts, and so well understood to be so intended. And if so, the question is, are the language and expressions imputed to him, fairly and reasonably interpreted, susceptible of a different construction? X think not, unless we can reasonably refer Horner’s refusal to give the bond and the promise to Watson, which was the ground of the refusal, to an objection to the form of the security, and not to an objection to being legally bound at all. Lobb v. Stanley, 5 Q. B. 574, (stated in 5 Harrison’s Digest, 229, 230,) and other English cases both before and since the 6 George IV, and Pratt v. Russell, 7 Cush. 462, and other American cases wherein the verbal promise was accompanied by a refusal to give a bond or bill or any other form of security, manifestly turned upon the quo animo or *reason of the refusal, whether to the form of the security or being boutid at all.
I suppose no one can doubt that it was the intention of the father-in-law, in requiring the promise, to lay Horner under an obligation not to bind himself and thereby to expose himself to legal actions, and to reduce himself to second bankruptcy by assuming his old debts. It was highly prudential, in giving him a fresh start, .to do so. It was neither against conscience, honor, law nor morals, for him to require the promise, nor in Horner to make it— properly interpreted, it was as morally binding upon him as it was to pay Mr. Speed his old debt when he should become able. And this promise was in no wise in conflict with his duty to Speed. It was not a promise not to pay when able, but not to bind himself legally to pay when peradventure he might not be able. And he had just as little moral right to palter with it as to withhold from Mr. Speed and all his other creditors their dues when he should become of ability to pay. To suppose, then, that the father-in-law employed the word bond, in its legal and technical sense and meaning, when he required the promise, or that Horner intended to use it in that sense in his conversation with Speed, would justly expose us to the application of the maxim qui haeret in litera, hasret in cortice. Nor is it to be presumed that Mr. Speed could understand it in that restricted and technical sense, as he might possibly have done had Horner refused to give a bond without assigning his reasons
—reasons which, to my mind, negative the hypothesis that the objection was to the form of the security, and render the inference irresistible that it was to being legally bound. Upon the whole, it seems to me to be impossible, without doing violence to all the reasonable presumptions and probabilities of the case, to conceive that Horner, whilst refusing to give a bond, upon which we cannot doubt, that Speed would have given the most liberal indulgence that Horner might require, should, at the *same time, have come or intended to come under a legal, verbal liability, that would have subjected him to immediate suit, and perhaps have turned his family' out of house and home, unless we resort to the strained inference, that he was deluding and tantalizing Speed with promises, intended to be legally binding, or which Speed might so understand, in secret and in the absence of a witness, which he intended to deny if sought to be enforced. For such duplicity I can perceive no adequate motive, and will not infer it.
Owing to the brief existence of the two bankrupt laws enacted by the Congress of the United States, we have but few American authorities on the subject, and, notwithstanding the continued existence of bankrupt laws in England for centuries, comparatively few British adjudications being directly on the question, though the decisions are numerous on the subject of the sufficiency of a new promise to remove the bar of the statute limitations, which are considered as having a close analogy to the cases of bankruptcy, and have been cited at the bar as apt illustrations and lights to guide in these decisions. In this dearth of direct authority and absence of any pertinent case to be found in the reported Virginia adjudications, the counsel for the demurrant cited and relied on the unreported case of Stewart’s adm’r v. Dolan’s adm’r, decided by the old Special Court of Appeals, (abolished in 1852,) in February, 1851, in which no opinion assigning the reasons of the decision was delivered. So far as the principle decided by that case can be gathered from the case itself, if it be authority, it is conclusive of this. It was a suit to recover upon the new promise and verbal as-sumpsit of a discharged bankrupt. The evidence to support it was, as in this, the testimony of a single witness; but differed in this: he was an eye and ear witness to the verbal assumpsit instead of a witness to the admissions by the bankrupt of the new promise. He deposed as follows, and this was the whole evidence: “In the year 1846, I *was walking with my father, Nath. W. Floyd, on Main street, in the town of Eynchburg, when we met James Dolan. My father spoke to said Dolan relative to said debt, and said James Dolan, in my presence, said he was getting under way again, and that he would pay the balance of said debt. I know of no other bond of James Dolan, or of said Dolan and A. Kinnier, to my father, N. W. Floyd, in his own right or as administrator of *871 Charles Stewart, save the bond filed in the case of Floyd, adm’r of Charles Stewart, dec’d, v. Dolan’s adm’r, in the Hustings Court of the corporation of Bynchburg, for S500, which, I doubt not, is the same mentioned in the question, upon which there was a balance claimed of some $95, with several years’ interest. That was the bond I referred to in my conversation with my father, above alluded to, and that the balance I understood Dolan to allude to — indeed, I have no doubt that was the debt.” To that evidence the defendant demurred. Hpon the demurrer, the court below held the evidence insufficient, and sustained the demurrer; and upon error to the court above, the special court affirmed the judgment. If what I interpret to be the ruling of the court in that case be good law, it puts the insufficiency of the evidence in this case beyond cavil, question or debate.
But, without invoking the support and sanction of that case, however direct, (because a sub silentio decision,) as authority for this, I am of opinion, upon the principles upon which I have based it, and for the reasons assigned in support of my conclusions, that this judgment must be reversed, and judgment entered upon the demurrer to evidence, in favor of Horner, the plaintiff in error.
TYLER, J.
I propose (in addition to the views presented in the opinion of Judge Thompson) briefly to consider the testimony adduced by the plaintiff, which is embraced in the demurrer to evidence, and to enquire whether it maintains the issue joined on his part. *Before I proceed with this enquiry, it is proper to premise, that the only evidence in the record is the evidence on the part of the plaintiff; that it is conceded, in order to remove the bar of a certificate in bankruptcy, there must be proved, as a new cause of action, an express promise, and that no implication or inference is deducible from the acknowledgment of the debt as subsisting and unsatisfied. No objection being sustained to the pleadings, or to the action of the court below in passing on them, the material question is, have the promises laid in the declaration been proved according to the requirement of the law? In Bell v. Crawford, 8 Grat. 117, Judge Moncure, in delivering the opinion of a majority of the court, says that the case of Bell v. Morrison, ever since its decision, has been regarded in the United States as a leading case, and, in this State, the doctrine settled in that has been recognized and carried to its fullest extent. I propose, therefore, to test this case by the doctrine and principles established in that. In Bell v. Morrison, 1 Peters, 362, the court say: “If the bar (that is of the statute of limitations) is sought to be removed by the proof of a new promise, that promise, as a new cause of action, ought to be proved in a clear and explicit manner and be in its terms unequivocal and determinate, and, if any conditions are annexed, they ought to be shown to be performedand, further on, the court adds: “If there be accompanying circumstances which repel the presumption of a promise or an intention to pay —if the expressions be equivocal, vague and indeterminate, leading to no certain conclusions, but at least to probable inferences, which may affect different minds in different ways, we think they ought not to go to the jury as the evidence of a new promise to revive the cause of action.” These principles are the guards interposed by the law to prevent persons from being entrapped in careless conversations and betrayed by misrepresentations, whether designed or unintentional. In reviewing the testimony in this case, *1 have come to the conclusion, that, so far from the promise alleged to have been made being proved in a “clear and explicit manner” —so far from its being proved to be, as to its terms, “unequivocal and determinate,” the evidence to that point is so vague and uncertain, so inconsistent and contradictory, that it as well proves an absolute as a conditional, or a conditional as an absolute promise, and that the only fact in connection with the promise which is stated and not contradicted — the only light that illumines this chaotic mass (which is the evidence of the plaintiff) to a single point only, that of a promise, or no promise, is that the defendant never intended to bind himself at all, either by a verbal or written promise, to pay the debt.
Bet it be borne in mind, that the evidence and all the evidence, as to the promises, consists in a narrative of a conversation, occurring in the street, between the witness and the defendant Horner, and is contained in statement R R, and the answers brought out on cross-examination, &c. &c. And according to the analysis I have made of the evidence, it seems to me that statement R R, standing alone, would prove a conditional promise to pay — that is, to pay as soon as able; and if we proceed a step further, and take the latter part of the answer to the 15th interrogatory, it goes to confirm that view of the promise; but in prosecuting the inquiry another step in the cross-examination, and taking the answer of the witness to the 37th interrogatory, we are involved at once in doubt and uncertainty as to what were the terms of the promise — as that answer alone would establish an absolute promise; and while thus groping in doubt and uncertainty, and seeking for something to solve this apparent inconsistency and contradiction, we are informed by the answer to the 35th question, that the witness having stated all the conversation he recollected, in reference to defendant’s narrative of the alleged promise to Speed, on the road to Bynch-burg, he concludes, from what was said, that the defendant had no intention to bind himself to pay said *debt. I propose, therefore, to recur to the testimony itself, the better to understand its real character. In statement R R, after allusion to the note of $2,000, endorsed and *872 paid by Speed, the witness says, “Mr. Horner then said, that since taking the benefit of the bankrupt law of the United States, he had several times promised to pay that debt as soon as he was able, and he always intended to pay said debt to Mr. Speed, and that he had recently had a conversation with Mr. Speed on the subject of the debt, and had promised to pay him said debt; that this was a verbal promise, and after assigning a reason for not giving his bond for the debt, he expressed great anxiety to pay the debt, and his deep regret that Mr. Speed should lose by him.” By a fair interpretation of this language, by its grammatical or legal construction, it imports a promise to pay as soon as able. If this was language embodied in a sealed instrument, with all the solemnity and deliberation which is presumed to accompany the execution of specialties, it would . be held a conditional promise. If you construe the language in the second sentence, to wit, the “recent conversation,” &c., into an absolute promise, you must tear it from its context, from the sentence that precedes and that which follows it, and construe it as an independent sentence, which would be a violation of the plainest rules of grammatical construction; and if you construe it as an absolute promise to pay, you not only impair the obvious meaning of the narrative taken all together, but you render it absurd; because, while Horner is asserting his inability to pay, he is made to say, in the same breath, that he will pay without qualification, and then express his regrets that his friend may lose b3* him, by reason of his inability to pay. The promise to pay, in statement R R, according to all the rules of interpretation and construction, must, to preserve the sense and meaning of the narrative, refer to the defendant’s ability to pay.
But we are not left altogether to construction, conclusive as that may be, to understand the character and *terms of this promise thus far, because the witness, who details the narrative and who tells us he heard more than he repeats or recollects, was so fully impressed that the promise made to the plaintiff by the defendant was a conditional promise, that he says, in his answer to the 15th question at its close, that he would not have communicated the conversation to the plaintiff, but for the belief that Horner could only be compelled to pay on proof of his ability; and yet, as if to nullify his own conclusions and to involve the whole narrative in doubt, confusion and uncertainty, he tells us, in answer to the 38th question, that Horner annexed no condition of the promise which he (Horner) informed him (the witness) he had made to Speed, and of course it became, by this answer, an absolute promise ' by necessary implication; and then as if to obliterate all that preceded, and to render nugatory his entire statement, he says, in answer to the 35th question, in effect, that having stated all that he recollects in reference to this assumpsit of Horner to Speed, he believed, from what was said, that Horner never intended by said promise to bind himself to pay Speed the said debt. Now, I concede there is no foundation for the charge of intentional misrepresentation against this witness ; his answers on cross-examination repudiate such an idea; he may have been and doubtless was honest in all his details. But this confusion of ideas — this loose, vague, inconsistent and contradictory testimony — arises from the fact, that the witness had an indistinct and ill-defined recollection of what actually did pass, and protesting that he did not use the language of the defendant in detailing this narrative, but his own language, he thus conveys, by his narrative of the conversation, clothed in his own language, different ideas from those conveyed to him by the defendant in the conversation had between them.
I might pursue this investigation further, and show that the same inconsistency and uncertainty pervades the testimony of the witness on other points, but I forbear, because it cannot be, it seems to me, insisted that *the testimony of the witness is clear and explicit, as to the proof of the promise, or that the character and terms of the promise are unequivocal and determinate — for if so, we surely should not have had pages of printed matter, and hours of oral argument devoted to the task of reconciling what is termed apparent contradictions, seeming inconsistencies and unguarded replies to questions not comprehended by the witness; and these ingenious arguments, printed and oral, failing to accomplish their purpose, all they have failed to accomplish is to be effected by the magical influence of a demurrer to evidence ; and testimony which is loose, uncertain, inconsistent and irreconcilable, at once, by being embodied in a demurrer to evidence, becomes, by a sort of legal legerdemain, clear, explicit and consistent; and, through the medium of this demurrer, we are to see the testimony in a totally different light, and what, without its aid, is unsatisfactory and inconclusive, becomes with it convincing, satisfactory and conclusive.
There is, however, no such magic in a demurrer to evidence. A demurrer to evidence refers to the court to decide what the inference of law is upon the facts, (1 Phil. Rv. 313,) the demurrant admitting all that can be reasonably inferred by a jury from the evidence given by the other party, and waiving all the evidence on his part, which contradicts that offered by the other party, or which tends to establish a case inconsistent with the case proved by the evidence of the other party; Tutt v. Slaughter’s adm’r, 5 Grat. 364; but if the evidence of the other party is so uncertain, inconsistent and inconclusive, as not to prove his case, the demurrant does not, by demurring to the evidence, furnish the other party the least aid, or prejudice his own case in the slightest degree. In this case, the de-murrant offered no evidence — all the evidence is the evidence of the plaintiff. By *873 it he must stand or fall. He should in this case, as a new cause of action, have proved ail express promise to pay the debt, in the language of the court in Bell v. Morrison, in a clear and ^'explicit manner, and the terms of the promise should have been proved to be unequivocal and determinate. Has this been done? Are the proofs in the cause of this description? I think not. And if evidence of the character contained in this demurrer is to challenge our confidence and credence, to the extent of fixing liabilities, and subjecting parties to the consequences resulting therefrom, a pernicious precedent will have been established, and a signal boundary between truth and error obliterated.
I am, therefore, for reversing the judgment.
NASH, J., andCLOPTON, J., concurred with Judges THOMPSON and TYLER.