S. V. PICKENS v. RICHMOND AND DANVILLE RAILROAD COM-
PANY et al.

*Railroads—Damages for Expelling Passengers—Tender of Fare—
Necessary Force—Common Carrier—Contract.*

1. Officers of a railroad company have a right to expel a passenger who
   refuses to pay the fare, but no more force than is necessary should
   be used.

2. If a passenger refuses to pay his fare, forces the officers in charge of
   the train to stop and put him off at a point other than a *regular*
   station, or at which there would have been no delay but for the
   necessity of ejecting him, they may refuse the tender of his fare,
   and they may refuse his fare and put him off if he puts them to
   the trouble of stopping before he makes tender.

3. When he gets off at a regular depot and gets a ticket, this constitutes
   a new contract, and *will* entitle him to passage, with a tender of
   the money due for passage up to that point, and, according to
   some authorities, without it.

This was a CIVIL ACTION, tried before *Connor, J.,* at the
February Term, 1889, of the Superior Court of HENDERSON
County.

The plaintiff set out two causes of action, to both of which
the defendants, in their answer, made appropriate defences.

The defendants admitted that they are duly incorporated,
and subject to be sued in the Courts of this State, and that
they are common carriers.

The following issues were, without exception, drawn and
submitted to the jury:

FIRST CAUSE OF ACTION.

1. Did the defendant, on the 26th day of November, 1887,
sell the plaintiff the ticket, as set forth in allegation five of
the complaint? Answer: Yes.

2. Did the defendant, by its agents and servants, on the
19th day of January, 1888, unlawfully and in violation of

the terms of such ticket, refuse to carry plaintiff on its cars, and violently and wrongfully eject him therefrom, as alleged? Answer: No.

3. What damage did plaintiff sustain thereby?   Answer:

### SECOND CAUSE OF ACTION.

1. Did the defendant, on the 19th day of January, 1888, unlawfully and wrongfully refuse to carry plaintiff on its cars from the station at Campton, on its road, to Hendersonville, on said road, and unlawfully eject the plaintiff from its cars, as alleged?   Answer: Yes.

2. What damage did the plaintiff sustain thereby? Answer: One thousand dollars.

The material facts are given in the parts of the evidence set out below.

S. V. Pickens testified: " I am the plaintiff.   On the 26th day of November, 1887, I purchased of the defendant's agent, in the office of the Richmond and Danville Railroad Company, at Hendersonville, N. C., a ticket from Hendersonville, N. C., to Jacksonville, Fla., and return, for $27.50.   I went on it to Jacksonville, Fla., and returned as far as Campton, a station in South Carolina, on the Spartanburg and Asheville Railroad.   The first coupon carried me to Savannah, Ga.; it was taken off by the conductor.   The second carried me to Augusta; this was also taken off by the conductor. The third carried me to Columbia; this was punched by the conductor; and thence to Spartanburg.   The conductor again punched the coupon which called for Hendersonville, N. C. There was no change of cars at Spartanburg.   The last coupon has three holes punched in it.   Some two or three miles from Spartanburg, the conductor, Capt. Overton, called for my ticket; I showed it to him; he asked me why I did not have it signed and stamped at Jacksonville, Fla.; I do not remember what I said.   The fact was, that I had not

observed that it was necessary. I called his attention to the fact that other conductors had not objected to it—had punched it. It is six hundred miles from Jacksonville to Hendersonville. It is about fifty miles from Hendersonville to Spartanburg. I had come about five hundred and fifty miles on this ticket. It is one hundred and forty miles from Hendersonville to Columbia. I had traveled in the same car about ninety miles on the ticket." (The ticket was put in evidence.) "The conductor said that he could not recognize the ticket. I told him that the object of the endorsement was to prevent a fraud upon the company by a transfer of the ticket; that the object of the stamp was to identify me. I offered to sign my name on the ticket; I also offered to prove my identity by persons on the cars. He said that if he passed me, he would be responsible to the railroad company for the fare. I offered to indemnify him; I told him who I was, and that I was worth property. I proposed to come on to Hendersonville, and there I would identify myself. The only objection that he made was that the ticket was not stamped. He declined all of my propositions, and said that he would put me off at the next station unless I paid my fare. This I declined to do. I then went into another car. I then returned to the first-class car; two gentlemen came with me. The conductor said that they had second-class tickets, and would have to return to that car; they did so, and I followed them. The train stopped at Campton; the conductor came to me and ordered me off. I again offered him my ticket, which he refused. I then told him that it would take more than one to put me off. He called a young man named Page, and they put me off on the steps and then on the ground. I did not make as much resistance as I might have done, but if I had, they could have overcome it. They put me off in a determined manner, but did not use more force than was necessary; it was hastily done. They did not put off my baggage. I imme-

diately stepped back on the platform of the car. As I went up the steps, or before I left the ground, I took from my pocket two dollars and twenty-five cents, or more, in silver. I said to the conductor, 'I must go home; here is your fare.' I handed the money to him. I said, 'Give me my change.' I did not know the regular fare. He said, 'No! You must pay the entire distance from Spartanburg.' I replied to him that I had paid the penalty for not having a ticket by being ejected, and claimed to pay my way from there as a new passenger. He did not take the money; he became excited, and said that he should put me off again; that I should not come home on his train. I then told him to take the whole fare from Spartanburg. I was standing on the platform at that time. He was on the platform in front of me. He called some one. Page came, and was by me, and took hold of me and pushed me down the steps on the same side. I was still tendering, by language and by motion, the money to the conductor, with one hand; I had hold of the iron railing with the other hand. He took hold of my hand; wrenched it from the railing. They then put me on the ground—Page still holding me. I called the attention of persons near by to what had been done. The train started. Page held to me until the train moved more than the length of one coach; I think we were near the middle of the last coach. I said to Page, 'Young man, you have gone far enough in this matter; you are now off the train,' &c. 'Let go!' He did so. Just at that time I demanded my baggage; I do not know whether he heard me; he did not give it to me. The train stopped, and some one motioned to me to get on; I walked up to the car and got on. I then paid the conductor my fare—the same money that I had tendered him before—the two dollars. He took it. I used no rough language. There was quite a number of persons present— Mr. Taylor and wife, Mrs. Ripley and two other ladies, Mr. England, Mr. Frady, Mr. Ballou and others; I did not know

them all; some of them are here. I cannot say that this was done in their immediate presence; there was some crowd there. It was in broad daylight. When I went back, there was a great deal of discussion among the passengers; some of them took a good deal of interest in it. I heard it said that some of the passengers told the conductor that he had done wrong. Campton is a small village. Four gentlemen took an active part in the discussion. The conductor was passing in and out of the car. He came in and asked me the number of my ticket; I declined to show it to him. My mortification and humiliation of feeling was very great. I was just from a sick-bed. The night before, I was in a railroad wreck, and up most of the night. The weather was cold. I was physically depressed and worn out by expulsion. I was at home two days. I estimated my actual damage at four thousand to five thousand dollars. I would not undergo the same thing for that sum. I think that seven thousand to ten thousand would not be sufficient to punish the defendants for the way they treated me. The conductor was irritating in his manner and tone. I did not hear him swear."

W. S. Overton was introduced and testified in behalf of the defendant: "I was the conductor on the cars the day referred to by plaintiff. When I came to plaintiff to get his ticket I noticed that it was not stamped, and refused to take it. He said that he had got that far and would identify himself by Mr. Williams, of Hendersonville. I told him that I could not take it; that I would give him a receipt for the money and try to get it back for him at Asheville. He said that if I put him off he would sue the company. He went into the second-class car and got two men to come with him into the first-class car. I told them that as they had second-class tickets they would have to ride in the second-class car. They returned and plaintiff went with them. I went to him as we reached Campton and stopped the train. He offered me the ticket again. I refused to take it. We

then put him off.  After he got on the ground he offered to pay his fare from there to Hendersonville.  I told him he would have to pay from Spartanburg.  He then said that he would pay his fare from Spartanburg—it was two dollars.  I think that Mr. Lowrie suggested that I should let him get on.  I stopped the train and he got on.  As he paid me he said that he had two cases against me.  I have been in the employment of defendant five and a half years.  I am from Mooresville, North Carolina.  I was first fireman, then road hand, baggage master, then conductor."

*Cross-examined.*—" I got on the train at Spartanburg; it runs through from Columbia; I took charge at Spartanburg. The ticket should have been stamped at Jacksonville.  I saw that it had been punched.  He said that he had come that far on it.  I told him that I could not take the ticket; that unless he paid his fare I would have to put him off. Campton is a flag station.  He said that he would not go off, that I would have to put him off; that he would offer no resistance.  When he reached the ground he got on the car immediately and said that he would pay me from Campton. I demanded fare from Spartanburg, this being as far as I was responsible.  He refused to pay and I put him off.  I had reason to believe that he had come from Columbia to Spartanburg on that car and on that ticket.  I do not think that I used any profane language.  I do not remember that I said he was a fool; I do not think that I said he was a damn fool; I am not certain, I may have said it and forgotten it; I do not think that I did.  There was a sleeper attached to the train.  Plaintiff was put off at the back end of the second-class car; there were two cars behind this. The company had a rule that no employee should use any profane language near the cars.  We stopped at Campton to put the plaintiff off.  I pulled the rope.  I had instructions not to take these tickets unless stamped.  If I had done so I would have been responsible for the fare.  Pas-

sengers got on and off at Campton; we do not stop unless 'warned down;' I stopped there for the sole purpose of putting the plaintiff off. This line runs to Augusta."

There was much other evidence introduced by both plaintiff and defendant corroborative or contradictory of much that is set out, and showing, or else denying, that plaintiff offered to pay full fare from Spartanburg before he was put on the ground the second time.

The plaintiff's counsel requested the Court to instruct the jury in regard to the first cause of action:

"The contract upon the ticket, requiring it to be stamped and countersigned at Jacksonville, Florida, is a simple contract, and may be waived by the authorized agent of defendant; and if upon the return trip the conductor accepted the ticket as offered by the plaintiff, without having been countersigned and stamped by the agent at Jacksonville, as one of its conditions required, and without such stamping and signing had passed plaintiff upon it from Jacksonville to Columbia, S. C., as testified by plaintiff; and if at Columbia he took a coach which came through to Hendersonville, and the conductors, the agents of the Richmond and Danville Railroad Company, accepted said ticket and passed plaintiff upon it to Spartanburg, and left the ticket with plaintiff with the punch marks on it, to be taken up by the conductor from Spartanburg to Hendersonville, these acts in law constitute a waiver of the right to enforce the requirement to have it stamped and signed, and the conductor from Spartanburg had no right to refuse to pass plaintiff the remainder of the trip upon it, and his expulsion from the train was unlawful."

The Court refused to give the instruction, and plaintiff excepted.

The plaintiff's counsel requested the Court to charge the jury upon the second cause of action:

"The plaintiff being in fact the real purchaser of the ticket, and having used it, unstamped, and not countersigned at Jacksonville, from that point to Spartanburg, by the sanction and consent of the conductors, and without any objection made by any of them, and being the *bona fide* owner, presenting it to the conductor after leaving Spartanburg, offering at the same time to identify himself, if required, the plaintiff was not a trespasser upon defendant's cars, and if he tendered the fare from Campton to Hendersonville, at the former place and before the train had started, he was entitled to ride, and his expulsion was unlawful."

The Court declined to give the instruction, and the plaintiff excepted.

The defendant's counsel requested the Court to instruct the jury:

"If the plaintiff refuses to exhibit a lawful ticket, or to pay full fare for the whole distance ridden by him from Spartanburg, when demanded by the conductor, he had a right to put him off the train, and when he was put off at a flag station, at which point the train had stopped for that purpose alone, plaintiff could not claim the right to get back on the train and continue his journey by agreeing to pay the fare, which he previously refused to pay. When plaintiff refused to pay full fare, and the conductor was in the act of ejecting him, he could not, by offering to pay, acquire the right to again become a passenger on the same train."

The Court declined to give either of said instructions, and defendant excepted.

The Court then instructed the jury:

"The plaintiff was bound by the contract in the face of the ticket, and by the terms of such contract he could not demand passage upon the ticket on his return from Jacksonville until it had been signed by him and stamped by the agent at Jacksonville. That the conductor was under no

obligation to accept the ticket without such stamp, and, upon refusal to pay his fare, was justified in expelling him from the car. The plaintiff says he used no more force than was necessary to do so. The fact that plaintiff had used the ticket from Jacksonville, Fla., to Spartanburg, S. C., without having complied with the terms of the contract on his ticket, did not, in law, operate as a waiver by the defendant.of the conditions thereof. The second issue should, therefore, be answered in the negative. The first is, by consent, answered in the affirmative.

" This disposes of the plaintiff's first cause of action, and it is unnecessary for you to consider the third issue."

The plaintiff excepted.

"In regard to the plaintiff's second cause of action—

"The plaintiff being in the car without a ticket, which the conductor, under his instructions, could accept, and having, as he admits, refused to pay his fare, and being rightfully expelled, he could not, lawfully, demand passage to Hendersonville, without paying his fare from Spartanburg—that being the point from which the conductor was in charge of the train—and his offer to pay fare from Campton to Hendersonville did not entitle him to remain on the cars. The conductor was, therefore, justified in again expelling him, he having gone upon the platform. In doing so, he could not, lawfully, use more force than was necessary.

"In regard to the second phase of testimony bearing upon this alleged cause of action, there is some conflict among the witnesses, and it will be your duty to reconcile such conflict, so far as you can, and to arrive at the truth. In doing so, discard from your minds entirely the fact that plaintiff is a citizen of your county and the defendants are corporations. The counsel on both sides of this controversy have, with great propriety, warned you against considerations of this character. You are to be guided by the tes-

timony as you hear it, and nothing else, in arriving at the truth in regard to the facts. You are to apply to such facts as you may find them the rule of law as I shall give it to to you, and thereby arrive at your verdict.

" The plaintiff insists that, by the testimony, it is shown that, while he is still on the platform of the car, and the defendants' servants were in the act of expelling him, having the money in his hand, the train standing, and not in motion, he offered to pay his fare from Spartanburg to Hendersonville. That the conductor refused to accept such offer, and ejected him the second time. That the station was one at which tickets were sold, and passengers taken on and allowed to leave the train.

" The defendants, on the contrary, insist that the testimony shows that, at the time the plaintiff made the offer to pay the full fare he had been ejected and was on the ground; that the cars were in motion. That Campton was, and is, a flag station, and that the train was stopped for the sole purpose of ejecting plaintiff, and that he had no right to re-enter the train. You will remember the testimony of the plaintiff, the conductor and other witnesses who testified in regard to the transaction. It is your duty, also, to consider the argument of counsel which has been made, and endeavor to obtain therefrom assistance in reaching a correct conclusion. The plaintiff requests me, and I charge you—

" If you find that while the train was standing at Campton, and before it had moved, the plaintiff, at any time, tendered or offered to pay the fare from Spartanburg to Hendersonville, the conductor should have received it and permitted the plaintiff to continue his journey, and his refusal to do so was wrongful, and his expulsion, if you find that he was expelled after making such a tender, was unlawful, and your answer to this issue should be in the affirmative.

" But if you find from the testimony that the plaintiff did not make such tender until after the train had started and

104—21

was in motion, the conductor was under no obligation to stop the train and receive him into the car, and you should answer this issue in the negative.

"If you find the issue in the affirmative you should, in answer to the next issue, award to the plaintiff such damages as will compensate him for the injury which he sustained by such expulsion. In doing so you should include such actual damage as he sustained from exposure, cold, the treatment received, mortification and humiliation of feelings. The damages should be confined to such as were sustained by his eviction after the tender of his fare from Spartanburg. In addition thereto you may, if you find that there was any violent, profane or insulting language used and applied to the plaintiff, or any wanton or unnecessary indignity offered to plaintiff, if in the exercise of your sound judgment you deem proper, give him such vindictive or exemplary damages as you think just and right under the circumstances."

In response to a prayer by defendants' counsel, the Court further instructed the jury—

"But in the absence of evidence of insult, violence or wanton injury, the plaintiff cannot recover more than actual damages."

The defendants excepted to the refusal to charge as requested and to the charges given.

The defendants made a motion for a new trial for error in refusal to instruct the jury as requested and in the instructions given. Motion denied.

The defendants then moved the Court to set aside the verdict because the damages assessed were excessive. Motion denied. Judgment. The defendants appealed.

*Mr. J. B. Batchelor*, for plaintiff.

*Messrs. D. Schenck* (by brief) and *F. H. Busbee*, for the defendants.

AVERY, J.—after stating the facts: The plaintiff's first cause of action was founded on the failure and refusal of the defendant companies to perform the contract arising out of the purchase by plaintiff at Hendersonville, North Carolina, of a return ticket from that place to Jacksonville, Florida, and his ejection from the car of the Spartanburg & Asheville Railroad Company, on his return, at a place called Campton, on their road, because he had failed to sign said ticket and have it stamped by the agent at Jacksonville, according to the contract printed in it. The second cause of action was, the alleged wrongful expulsion of the plaintiff and the refusal of the agent of the defendant, after he had been ejected from the train, and while he was being expelled, to accept the tender of money made by him for his fare.

We cannot consider the reasonableness of the regulation in reference to signing and stamping the plaintiff's ticket, for in the discussion of this appeal that cannot now be treated as an open question. The Judge below instructed the jury as to the nature of the contract and the alleged waiver of it by the railroad companies, and the jury found the issue arising out of that cause of action for the defendants. The plaintiff did not appeal and the defendants assign as error only, the refusal of the Court to give the instruction asked, and the giving of that substituted for it upon the issues involved in the second cause of action.

Following the general current of authority in the United States, this Court has held that the officers of a railroad company have a right to expel a passenger who refuses to pay the railroad fare, provided no more force is used than is necessary in ejecting him. *Clark* v. *Railroad*, 91 N. C., 512; *Skillman* v. *Cincinnati S. & C. Railroad Co.*, 13 Am. & En. R. Cases, 31; *Toledo & C. Railroad Co.* v. *Wright*, 34 Am. Rep., 277; *L. L. & M. L. Railroad Co.* v. *Pierce*, 3 Am. & En. R. Cases, 340; 38 Am. & En. R. Cases, 556, and note; *Petrie*

v. *Penn. Railroad Co.*, 42 N. J., 449. In *Clark* v. *Railroad, supra*, the Court says further, in reference to the expulsion of a passenger who has refused to pay, "Nor, when the officer has stopped the train and he is descending the steps and is about to pass out, will a tender of the fare entitle him to return to his seat. He forfeits his right of carriage by such misconduct, by breaking his own contract to pay, when called on, and it is not regained by his repentance at the last moment and after he has caused the inconvenience and delay to the company by his wrongful act."

If the tender of fare is made by a passenger or any other person for him before the train is stopped to expel him, the company must accept it and allow him to remain, but after the train has been stopped for that purpose, he cannot reimpose upon the company the obligation to perform a contract which he had violated in the first instance, by an offer of the money that he ought to have paid when demanded. *Hoffman* v. *The D. & N. W. Railroad Co.*, 52 Iowa, 342. If persons were allowed, out of mere wantonness or mischief, or in order to test a legal question, to decline to pay fare, till a train is stopped to eject them, and then, at the moment of expulsion or immediately after, to reinstate themselves in all their original rights as passengers, by a tender of the usual fare, it would often subject the public to inconvenience, travellers to danger of accident, and corporations to useless risks, simply to gratify caprice, or malice, or a disposition to speculate.

It is a well settled principle, in which nearly all the authorities in this country concur, that, where the recusant passenger forces the company to put him off at a point other than a regular station, or at which there would have been no delay but for the necessity of ejecting him, the conductor may refuse his tender of fare after he is put off, and, even if during the delay he gets upon the train again to make the tender, may expel him a second time if he

chooses to do so.   3 Hood's R. L., §§ 361, 362, and notes; *Hoff-man* v. *D. & N. W. Railroad Co., supra.*   When a person is put off a train for refusal to pay fare at a regular station, or so near it that he can reach it while the train is stopping there, and buys a ticket from such depot to some point in the direction in which he is travelling, the weight of author-ity is in favor of the rule that he can be required, even then, to pay charges for the distance that he previously rode on the train without a ticket, and be ejected for refusal to do so.   3 Hood's R. L., § 361; *Stone* v. *C. & N. W Railroad Co.,* 29 Am. Rep., 458 (47 Iowa 83).

We think that there was error in the instruction given by the Judge below.   After careful scrutiny of the evidence of every witness we fail to find any testimony tending to show that tickets were sold at Campton and to justify the instruc-tion predicated upon the idea that it was a regular station. But, conceding that tickets were sold there, and that pas-sengers sometimes got on and off there, it is in evidence, and is not disputed, that the particular train on which the plaintiff was travelling, would not have stopped at Camp-ton but for the purpose of expelling him from it.   If that be true, both reason and authority sustain the right of the conductor to put him off, and to refuse him readmission, just as he might have done at any point on the line where there was not even a house.

If Campton was a regular station, and while the train was detained there the plaintiff had bought a ticket to Hender-sonville, and again entered the train and tendered the fare from Spartanburg to that point, in money, with the ticket, that state of facts would have presented a very different ques-tion.   The ticket issued by its agent would have constituted a new contract on the part of the company, by which, with the tender of the amount previously due, and, according to some authorities, without it, the company would have been compelled to transport him on its train to Hendersonville.

But it is not essential that we should pass upon that question.

So far as this train was concerned, on this particular occasion, the conduct of the plaintiff was the only cause for stopping it at Campton. When the detention was due solely to his refusal to perform the implied contract, growing out of his getting on the train by paying the usual fare to his destination, the law will sustain the company in insisting that he shall pay the penalty of such persistent refusal by being himself subjected to inconvenience without compensation.

His Honor should have instructed the jury that, as the train was stopped only for the purpose of putting the plaintiff off, he was not entitled to recover damages for the refusal to accept fare after the train stopped or for again ejecting him while the train was standing there. *O'Brien* v. *Railroad Co*, 80 N. Y., 236.

There is error, for which a new trial will be granted.

Error.