Wytheville.

## MANGUM V. NORFOLK AND WESTERN RAILWAY COMPANY.

### June 12, 1919.

1. PASSENGERS — *Illegal Ejection From Train — Right to Re-enter Train.*—If a passenger was illegally ejected from a train in the first instance, he did not lose his rights as a passenger, and had the right to re-enter it, though not put off at a regular station, and to continue his journey, upon tender of the regular fare; and, if the tender was refused, the subsequent acts of the servants of the company in arresting and confining him and bringing him before a police justice, were illegal, and he had the right to recover damages therefor.

2. CARRIERS OF PASSENGERS—*Ejection—Duty of Conductor—Tender of Fare.*—It is the duty of the conductor to see that each passenger pays his fare. In the instant case the passenger tendered a ticket that was out of date. Upon being told by the conductor that it was no good he tendered a second ticket that was out of date. The passenger gave no explanation of his conduct, and the conductor was not chargeable with knowledge of his thoughts. When told that his second ticket was no good, and he must pay his fare or get off, his reply was, "Well, pull it down," thereby refusing to pay his fare. If the conductor had then "pulled it down" and put him off, he would have been without fault, but before he could do so, the passenger recanted and offered to pay his fare. Aggravating as the situation was, the conductor should have accepted the fare when tendered, and not have put the passenger off.

3. DEMURRER TO THE EVIDENCE—*Inferences Most Favorable to Demurree.*—On a demurrer to the evidence, if several inferences may be drawn from the evidence, differing in degree of probability, the court must adopt those most favorable to the demurree, providing they be not forced, strained or manifestly repugnant to reason.

4. CARRIERS OF PASSENGERS—*Right of Passenger Where Validity of Ticket is Disputed.*—Where a passenger was acting in good faith, and honestly believed that his ticket was good and entitled him to passage, he was entitled to a reasonable parley with the conductor, or reasonable time in which to determine upon his course of action.

5. Carriers of Passengers—*Tickets and Fares—Rights as Between Passenger and Conductor—Right of Passenger to Re-enter Car.* —As between the passenger and the conductor, the conductor is the sole judge of the validity of the ticket tendered in payment of the fare. If he decides that the ticket is invalid, he has the right, upon so notifying the passenger, to require the passenger to pay his fare, and, if he refuses to do so, to eject him from the train. If the passenger is acting in good faith and honestly believes his ticket is good and that he is entitled to ride thereon, he is entitled to a reasonable time and a fair opportunity to decide whether or not he will pay his fare. After he has had such time and opportunity, if he refuses to pay his fare, the conductor may eject him, and, when once lawfully ejected at a point at which that train would not otherwise have stopped, he has no right to re-enter that train upon tender of fare. The passenger's right to tender his fare and continue his journey, after having refused payment, continues until the conductor has rightfully given the engineer the signal to stop the train, no longer. A tender after the signal to stop has been rightfully given comes too late to revive the right of the passenger which he lost by refusal to pay his fare. He may not thus interfere with the proper conduct of the carrier's business, and the convenience and safety of the traveling public.

6. Carriers of Passengers—*Ejection of Passenger — Subsequent Acts of Servants of Carrier.*—Where the ejection of a passenger is wrongful, all of the subsequent acts of the conductor and other employees of the company in arresting and confining the passenger and taking him before a magistrate are likewise wrongful, and for these wrongs the carrier is liable.

7. Carriers of Passengers—*Ejection of Passenger — Damages.*— Where a passenger was wrongfully ejected from a train, and upon re-entering the train was arrested, confined and taken before a magistrate, he was subjected to such humiliation, discomfort, and disgrace as entitled him to recover substantial damages.

Error to a judgment of the Circuit Court of Prince George county in an action of trespass on the case. Judgment for defendant. Plaintiff assigns error.

*Reversed.*

The opinion states the case.

*Bernard Mann* and *R. H. Mann,* for the plaintiff in error.

*Wm. B. McIlwaine, J. M. Townsend* and *Theodore W. Reath,* for the defendant in error.

BURKS, J., delivered the opinion of the court.

This was an action of trespass on the case, brought by Wiley P. Mangum against the Norfolk and Western Railway Company. After all the evidence on both sides had been introduced, the defendant demurred to the plaintiff's evidence. The case will be stated, therefore, under the rule obtaining on a demurrer to the evidence, which is too familiar to occupy space in restating it.

In 1916 there was in operation at Hopewell what is generally known as the Du Pont munition works, employing many thousand operatives. Hopewell is nine miles from Petersburg, and large numbers of these operatives lodged in Petersburg. These operatives worked in shifts so that many of them had to be transferred from one city to the other at least twice a day. During this period, the Norfolk and Western Railway Company operated between the two cities a number of trains daily. These trains were composed of fifteen or sixteen coaches each, and were generally crowded even on the platforms. Some, if not all, of these trains carried three conductors to collect fares, and as the distance between the cities was so short it took practically all of their time to collect the fares. There were no regular stops between the two cities, but there were several flag stations where passengers would be taken on or put off upon signal to the engineer. No tickets were required to entitle a passenger to ride, but the rate was the same whether paid in money or by the use of a ticket. The railroad company, however, sold two kinds of round-trip tickets good for two days only, including the date of issue, one

known as a reel ticket, the other as a card ticket. The date of the sale was printed on the face of the reel tickets and stamped on the back of the card tickets. The railroad company sold several thousand of these tickets daily. The character of the employees of the munition works who were transported by the railway company daily between the two cities is described by one witness as "the worst people on earth, just the scrapings or scrubs of the earth, they came from all parts of the world," and by another as being "about as rough as they could get." The straight fare was only twenty-five cents, but they resorted to all sorts of expedients to avoid its payment. One of the witnesses says: "I have known them to band together in order to beat the conductor and to give him trouble, and one would make the conductor stop the train and put him off, and five or six others would drop off the train and run around where the conductor had been already, in order to get down free." Again: "you could come along with your punch and a man would have a round-trip ticket, and when you would punch it he would hold his hat there and catch the punch part, and after you went past he would get that punch part and put it back and pass it tomorrow morning, he would give you that same ticket to punch again." Owing to conditions on the road, the company had special police agents on all of these trains to preserve order and to assist the conductors in enforcing the rules of the company. The ejection of passengers was of almost daily occurrence.

The plaintiff, Mangum, testifies that on March 10, 1916, he purchased a round-trip reel ticket about 3 o'clock P. M., rode from Petersburg to Hopewell on it and came back on the street car, and put it into his vest pocket and kept it there until "it had gotten out of date." In answer to further interrogatories, he testified as follows:

"Q. Now, please explain to the jury what ticket you had on the 14th of March, 1916, where you got it, and how you came to get it?

"A. Well, this ticket, dated for the 10th, I had left over in my vest pocket, and the ticket which was dated the 13th which I was using on the morning of the 14th, as I was coming out from the plant after 7 o'clock to get on the morning train from Hopewell that leaves there at 7:30, as I was coming out of the subway a young man hollered, 'Ticket for sale,' and me knowing that I did not have any ticket, I asked him, I said, 'What is the price of the ticket?' and he said 'Ten cents,' and I gave him ten cents, and turned the ticket over and looked at it and just merely saw that it was dated for the 13th, that is all the inspection I gave the ticket whatever, and I put it in my pocket and went and got on the train. The conductor came through taking up the tickets, and I ran my hand in my pocket and got the ticket. I got this one dated the 10th, this reel ticket, and the conductor taken the ticket and made a space or two ahead, and came back and said, 'This ticket is no good,' and I seen right away what I did, so I put my hand in my pocket and got the second ticket which was dated the 13th, and which was apparently a good ticket; I thought it was then, and I think yet it is a good ticket, and I tendered the ticket to the conductor, and he made a space or two ahead the second time and came back and said, 'This ticket is no good, you will have to pay your fare or get off,' and my thinking it was a good ticket and I yet believe it is a good ticket, I said to him, 'Well, pull it down.' He pulled the cord, and as I did so I realized where I was at, and I was worn out from twelve hours' work and traveling back and forth, and I decided that I would pay him rather than be put off there like I would have been, so I proceeded to get up as he was pulling the cord the first time to give the engineer the signal to stop, and I brought some money from my pocket; I couldn't say just the amount, but I had some change. I do not think I had a quarter then, but I had a quarter in

my pocket, and I offered to pay the conductor, and he said, 'No, it is too late now, you will have to get off.'

    \*        \*        \*        \*        \*

"Q. When you told the conductor, 'Well, pull her down,' or something like that, did you think he was going to pull it down?

"A. No, sir, I had no idea he would stop the train and put me off, because I though I had a good ticket all the time.

"Q. And when you saw, or as soon as you saw that he was going to put you off, then you made a tender of your fare, and he told you it was too late?

"A. Yes sir, I tendered the fare before he got through pulling the first time on the cord, which was the signal to stop the train. \* \* \*

"Q. Now, just tell the jury, Mr. Mangum, what happened after the train started, after you were put off?

"A. After I was put off the train, of course the train started up, and I let the coach pass me that I had just gotten off, and there was a young gentleman on there and he held up his hand and call out to me, and he said, 'Come and get on, I have some money to pay your fare,' and I said, 'No, I have got the money myself,' so I decided that I had a right to ride that train on in, I had not done anything, and I got on the step to the second car; in other words, I got off the front end of one car and got on the front of the next, and got up on the steps and was standing there with one foot on the platform and one on the step, and this young gentleman came back and seen me and then got a detective."

The signal to stop a train is two pulls on the cord. A single pull means nothing. After Mangum was put off, the train started and he got on the coach next to the one from which he was ejected. The conductor saw him and had him arrested by the special police officer on the train, who de-

tained him in the baggage coach until they arrived at Petersburg. He testified, "I offered to pay my fare the second time when I got back on the train and they refused it." At Petersburg he asked the police officer to permit him to walk up to the police station, but the offer was declined and the patrol wagon was called up over the phone and Mangum was put in the "cage" of the wagon and taken to the police station. Here he was searched and then placed in the "lock-up" among "negroes and negro women, and a low-down class of white women and all kinds of men," and kept there about two hours. He was then brought before the police justice, who dismissed the case for want of jurisdiction, as the alleged trespass, if any, did not occur within his jurisdiction. When the card ticket (the second one presented) was presented to the conductor, the conductor said it was "no good" and that Mangum must pay his fare or get off. He did not assign any reason, at that time, why it was "no good," nor did Mangum ask any, but simply said, "Well, pull it down." But before this suggestion was acted on, and while the conductor was "pulling the cord the first time to give the engineer the signal to stop," Mangum testified that he changed his mind and offered to pay his fare, but the conductor said, "No, it is too late now, you will have to get off." Mangum further testified that he thought at that time, and still thought at the time of the trial that the ticket was "a good ticket." The company claimed that the date stamped on the back of the ticket had been changed and that it was out of date, and further that an inspection of the ticket would disclose the fact that the original date had been erased and another stamped in its place. When Mangum was asked if he could see where the ticket had been tampered with, he replied, "Not to detect it with my natural eye, to know positively it had, I could not." The original ticket was presented in the trial court and also in this court. It is said to have been handled a great deal

during the trials, and not now to present the same appearance as when tendered, and it bears the appearance of having been much handled, but at present the erasure, if any, is not apparent.

[1]    If Mangum was illegally ejected from the train in the first instance, he never lost his rights as a passanger, and had the right to re-enter it, though not put off at a regular station, and to continue his journey, upon tender of the regular fare from Hopewell to Petersburg, and, if the tender was refused, the subsequent acts of the servants of the company, hereinbefore detailed, were illegal, and he had the right to recover damages therefor.

[2, 3]    The circumstances surrounding the conductor were very trying.    He had a very short run to make and many tickets to take up.    The company was issuing several thousand round-trip tickets a day containing a two-days' limit, and he had to inspect the dates carefully to see that the tickets were valid.    He had very little time to parley on the subject, and he was handling a class of passengers whom he knew were endeavoring to defraud the company of its fare to such an extent that ejections of pasengers were of almost daily occurrence.    It was his duty to see that each passenger paid his fare, and in this case the passenger had tendered him a second ticket that was out of date.    The passenger gave no explanation of his conduct and the conductor was not chargeable with knowledge of his thoughts. When told that his second ticket was "no good," and he must pay his fare or get off, his reply was, "Well, pull it down," thereby refusing to pay his fare and accepting the alternative presented to him.    If the conductor had then "pulled it down" and put him off, he would have been without fault. But before he could do so, the passenger recanted and offered to pay his fare.    It is true that the conductor had to act promptly, but not instantaneously, for there were several flag stops on the route at which stops were made on re-

quest, and the time taken by the passenger to recant was much less than would have been required to make one of these stops. Aggravating as the situation was, the conductor should have accepted the fare when tendered, and not have put the passenger off. There was some evidence on behalf of the plaintiff tending to show that the passenger did not make his tender of payment till after the conductor had "pulled it down" and the train was slowing up, but Mangum testifies distinctly to the contrary, and his statement must be accepted as true, because on a demurrer to the evidence, "if several inferences may be drawn from the evidence, differing in degrees of probability,. the court must adopt those most favorable to the demurree, providing they be not forced, strained or manifestly repugnant to reason." *Horner* v. *Speed,* 2 Pat. & H. 616.

[4] After Mangum was arrested and carried into the baggage car, it was explained to him that the serial number of his ticket and the space between the figures of the date stamped on it, as well as the erasure, showed the invalidity of his ticket, and he again offered to pay his fare, but it was refused. It required but a little time to give this explanation, and doubtless if it had been given in the first instance the fare would have been paid, but it was not given. If Mangum was acting in good faith, and honestly believed that his ticket was good and entitled him to passage, he was entitled to a reasonable parley with the conductor, or reasonable time in which to determine upon his course of action. There was evidence in the case from which the jury might have found that Mangum was acting in good faith and honestly believed that his ticket was good and that the conductor did not give him a reasonable time within which to determine upon his course of action, and consequently we must so hold.

[5] The decided cases on the right of the carrier to eject a passenger for refusal to pay his fare are very numerous, and not altogether in harmony. It will not be nec-

essary to discuss the nice distinctions drawn in some of them, but confining ourselves to the facts of the case in judgment, the following propositions of law applicable thereto seem to be well sustained by the authorities. As between the passenger and the conductor, the conductor is the sole judge of the validity of the ticket tendered in payment of the fare. If he decides that the ticket is invalid, he has the right, upon so notifying the passenger, to require the passenger to pay his fare, and if he refuses to do so to eject him from the train. If the passenger is acting in good faith and honestly believes his ticket is good and that he is entitled to ride thereon, he is entitled to a reasonable time and a fair opportunity to decide whether or not he will pay his fare. After he has had such time and opportunity, if he refuses to pay his fare, the conductor may eject him, and when once lawfully ejected at a point at which that train would not otherwise have stopped, he has no right to re-enter that train upon tender of fare. The passenger's right to tender his fare and continue his journey, after having refused payment, continues until the conductor has rightfully given the engineer the signal to stop the train, no longer. A tender after the signal to stop has been rightfully given comes too late to revive the right of the passenger which he lost by refusal to pay his fare. He may not thus interfere with the proper conduct of the carrier's business, and the convenience and safety of the traveling public. *Huffold* v. *Grand Rapids, etc., R. Co.,* 53 Mich. 118, 18 N. W. 580; *Frederick* v. *Marquette R. Co.,* 37 Mich. 342, 26 Am. Rep. 531; *Va. & S. W. R. Co.* v. *Hill,* 105 Va. 729, 54 S. E. 872, 6 L. R. A. (N. S.) 899; *Pease* v. *Railroad Co.,* 101 N. Y. 367; *Pickens* v. *Railroad Co.,* 104 N. C. 312, 10 S. E. 556; *Louisville, etc., R. Co.* v. *Harris,* 9 Lea (Tenn.) 180, 42 Am. Rep. 668; *Texas, etc., R. Co.* v. *Bond,* 62 Tex. 442, 50 Am. Rep. 532; *Missouri, etc., Ry. Co.* v. *Smith,* 152 Fed. 608, 81 C. C. A. 598, 10 Ann. Cas. 939; *Hoffbauer* v. *Delaware, etc.,*

*R. Co.,* 52 Iowa 342, 3 N. W. 121, 35 Am. Rep. 278; *Kirk* v. *Seattle Electric Co.,* 58 Wash. 283, 108 Pac. 604, 31 L. R. A. (N. S.) 991, and note; *Georgia, etc., R. Co.* v. *Asmore,* 88 Ga. 529, 15 S. E. 13, 16 L. R. A. 53; 2 Hutchinson on Carriers (3d ed.), sec. 1085; 5 R. C. L., p. 119, sec. 749.

Upon the defendant's demurrer to the evidence, we must hold that the plaintiff in error acted in good faith, and honestly believed that his ticket was good and entitled him to passage; that the plaintiff in error offered to pay his fare while the conductor was pulling the bell-cord for the first time and before the stop signal had been completed; that the signal could easily have been stopped at this time, without inconvenience to any one, and that the conductor wrongfully refused to accept the fare when so tendered and wrongfully ejected the plaintiff in error from the train.

[6]    The ejection of the plaintiff in error being wrongful, all of the subsequent acts of the conductor and other employees of the company hereinbefore detailed were likewise wrongful, and for these wrongs the defendant company is liable. *Norfolk & W. Ry. Co.* v. *Perdue,* 117 Va. 111, 83 S. E. 1058; *Railroad Co.* v. *Henry,* 55 Kan. 716, 41 Pac. 952, 29 L. R. A. 465; *Railway Co.* v. *Conder,* 23 Tex. Civ. App. 488, 58 S. W. 58.

[7]    The verdict of the jury was not excessive. The plaintiff was unlawfully subjected to such humiliation, discomfort and disgrace as entitled him to recover substantial damages. *Bolton* v. *Vellines,* 94 Va. 393, 26 S. E. 847, 64 Am. St. Rep. 737.

The judgment of the circuit court will be reversed, and this court will enter such judgment as the said circuit court ought to have entered, overruling the demurrer to the evidence and giving judgment in favor of the plaintiff for the sum of $2,000, with legal interest thereon from June 1, 1917, until payment, and for the costs.

*Reversed.*