# CHARLESTON.

## HATFIELD *v.* ALLISON.

Submitted February 22, 1905.     Decided March 14, 1905.

1. EXPRESS TRUST—*Oral Evidence.*

  Oral evidence, to establish an express trust must be clear and unquestionable. (p. 379).

2. RESULTING TRUST IN JUDICIAL SALE—*General Warranty—Error.*

  When a purchaser of land in his own name at judicial sale, is required by decree to convey the land to the debtor as having purchased it in trust for him, it is error to require the purchaser to convey the land to the debtor "With covenants of general warranty." (p. 384).

Appeal from Circuit Court, Mingo County.

Bill by Sanford Hatfield against R. C. Allison and others. Decree for plaintiff, and defendants appeal.

*Reversed.*

SHEPPARD & GOODYKOONTZ, for appellants.

H. K. SHUMATE, for appellee.

McWHORTER, JUDGE:

At a judicial sale made in the case of W. F. Farley against Sanford Hatfield *et al.* in Mingo county circuit court, R. C. Allison became the purchaser of a tract of two hundred and fifty acres of land sold as the property of Sanford Hatfield, at the price of $271.87, which sale was confirmed at the January term, 1898, of said court. Afterwards, on the 27th day of September, 1898, Wells Goodykoontz, special commissioner, the purchase money having all been paid, at the request of the purchaser R. C. Allison, conveyed the said two hundred and fifty acres of land to Allison and one William McGee, to whom Allison had sold an undivided half interest in the land. At the November rules, 1901, Sanford Hatfield, filed his bill in equity in the circuit court of Mingo county against R. C. Allison and William McGee, alleging that Allison had purchased the land for plaintiff at his request and was holding the same in trust for him, the plaintiff to return the purchase money paid by Allison with its interest. Plaintiff makes no allegation as to when the said money was to be returned, no time specified; but alleges that in the early part

of the year 1900, he had raised about $100.00 and offered to let Allison have it on account of the money he had paid on the land, but he refused to take it, giving as his reason that he could do nothing until he saw Mr. McGee who had furnished a part of the money to pay for the land; that subsequenty he raised some more money and again offered to pay the said liability and Allison refused, giving the same reason; that on one occasion, about a year before the filing of the bill, Allison stated to plaintiff that he had a letter from McGee, his co-defendant; that he had directed him to deed to plaintiff the surface and keep the minerals, which proposition plaintiff would not consider; that plaintiff then became alarmed and used every effort to raise the money sufficient to redeem the land, and on the 20th of March, 1901, having raised sufficient money, offered and tendered defendant Allison the entire amount of money and its intesest which he had paid on said land, and Allison refused to take it and replied that McGee had directed him not to take any money from, or give any writings to, the plaintiff; but that plaintiff could pay off a store account, which plaintiff did, and took a receipt therefor at the time; that on May 9, 1901, plaintiff handed to defendant Allison, $200.00 telling him to take it, that he wanted to be as good to him as he was to plaintiff, and said Allison stated that he was always ready to take money for paper and gave him a receipt therefor, which receipt was filed with the bill; that plaintiff intended said money as a payment on the money due Allison, but not being able to read writing plaintiff afterwards learned that said receipt was for $200.00 to be deposited in the Bank of Williamson for the plaintiff; that since giving Allison the said $200.00 plaintiff had offered to settle any balance that might be due him on said land purchase, but Allison refused to take anything or settle; but reiterated the statement that he would deed him back the surface and keep the minerals, which plaintiff refused to accept. Plaintiff alleged that the purchase of the two hundred and fifty acres of land by Allison was for the use and benefit of plaintiff; that at the time of its sale the land was worth at least $2,500.00, at a fair valuation; that if it had not been understood that said land was being purchased for plaintiff the land would have brought a much larger sum than three times the amount bid thereon; that the deed of conveyance to Allison and McGee

was without authority; that the deed was made and acknowl-
edged long before any authority was conferred upon special
commissioner Goodykoontz, to make such conveyance and no
conveyance whatever, was directed to be made to defendant
McGee; that the agreement, on the part of Allison to bid in
said land for plaintiff and hold it as a security for the amount
so bid and interest is enforceable in a court of equity, and the
refusal on the part of the defendants to convey said land to
plaintiff after a tender of the full amount due thereon was a
fraud upon plaintiff and cognizable in a court of equity; that
there had been paid to defendant Allison $200.00 of said pur-
chase money and the fact that the receipt therefor stated that
said sum was to be deposited in the Bank of Williamson did
not change its effect as a payment for the reason that plaintiff
did not so intend it for deposit and could not read said re-
ceipt and did not understand its import until long after the
payment of said money; that the said $200.00 was never de-
posited in the Bank of Williamson to the credit of plaintiff
by defendant Allison; but was kept and used by him, and
plaintiff tendered in open court, or to the order of defendants
the sum of $160.00 the balance due on said purchase money
and taxes paid thereon, if any, after deducting the $200.00
theretofore paid to defendant Allison, and prayed that the de-
fendants be compelled to convey to said plaintiff said two
hundred acres of land and for general relief, which bill was
verified.

Defendant Allison filed his demurrer and answer to said
bill and denied all the material allegations in the bill, charg-
ing that he had bought the land at the instance and for the
benefit of Hatfield or that he purchased it in pursuance of or
in accordance with any agreement with said Hatfield, or any
person for him; but averred that on the other hand he made
said purchase of his own motion and independently and with-
out any arrangement, agreement or contract with the said
Hatfield or that he did anything to prevent bidding by other
parties and denied the allegation of the bill that Hatfield re-
lied upon the good faith of respondent resting securely on
the arrangement and felt his land was safe, and made ar-
rangements to procure money for the purpose of repaying re-
spondent the amount advanced by him; but avers that on the
other hand Hatfield never thought of making claim of that

sort until long afterwards when the said land had advanced in value, and respondent, together with McGee, were about to make sale thereof at a figure sufficient to enable them to realize a remunerative profit for their investment; that respondent had permitted plaintiff . to retain possession of the land, the same not being very valuable for agricultural purposes and it was intended that possession of said land be held in order that the title might be fully protected by adverse possession, and respondent also felt that it would be a hardship on Hatfield, being poor in circumstances and with a large family and an invalid wife, to dispossess him by writ of possession of said premises, and that it was wholly due to these reasons that respondent and his co-defendant, McGee, permitted Hatfield to remain in possession; that the fact was that the surface was almost practically useless and utterly worthless to respondent and his co-defendant; but realizing that it was useful and material to said Hatfield and desiring to avoid the payment of taxes thereon, and thinking that such surface rights would be beneficial to said Hatfield informed him that they had decided to deed him the surface and the said Hatfield replied that "That was a mighty good present; that not many other men would do that;" that he seemed highly elated and pleased to know that the surface of said land was to be deeded to him, and seemed much gratified at the result. Respondent admits that he had in his possession about $182.00, less a small store account, belonging to Hatfield, being the same money left with him for which the receipt exhibited with the bill was given; admitted that the $200.00 was not deposited in the Bank of Williamson to the credit of Hatfield, and charged that the same was never intended to be deposited to Hatfield's credit, but that Hatfield came to him with $200.00 which was sewed up in a jacket and told respondent that it was too hot to work with the jacket on, and wanted him to take the money and lock it up in his safe and give him a receipt or statement showing the fact; respondent told him he would prefer to put it in bank and not keep it in the safe, and so stated in the receipt to Hatfield.

The defendant, McGee, filed his demurrer and answer alleging that he knew personally, little in regard to the transaction mentioned in the bill, but averred that within a few days after the purchase of the land by Allison, Allison wrote

him informing him of the purchase and offered him a half interest therein at the same price that Allison was to pay for it; that within a short time thereafter he went to West Virginia and saw Allison and paid him in full for one-half the purchase money; that at no time prior to said purchase nor afterwards until very recently had he any intimation from any source that Hatfield was claiming an interest in the land; that he was an innocent purchaser of said moiety for a valuable consideration without notice of any claim or equity on the part of Hatfield, and relied and insisted on the force and effect of the deed to himself and Allison. He adopted the allegations of the answer of Allison on information and belief that they were true and relied upon said answer as a defense in his behalf, both of which answers were verified.

Depositions were taken by both plaintiff and defendants and filed in the cause, and the cause was heard and the final decree entered on the 25th of September, 1903, on the bill and exhibits filed therewith, and the answers of the defendants and general replication thereto, and upon the depositions and orders and decrees theretofore made in the cause, the demurrers having been theretofore overruled, and the court decided that the plaintiff was entitled to the relief prayed for; decreed that upon the payment by the plaintiff of the sum of $186.75 to the defendant Allison, which was ascertained to be the balance due him, after deducting credits, the defendants, Allison and McGee should convey said two hundred and fifty acres of land to plaintiff with covenants of general warranty, and appointed a special commissioner to make such deed in their behalf upon their failure to do so. The plaintiff tendered in open court to the defendants the said sum which defendants declined to receive, when it was ordered to be paid into the hands of the general receiver of the court subject to the order of the defendants; from which decree the defendants appealed and say that the court erred in holding that any express, or other trust had been established, and in directing a conveyance of the two hundred and fifty acres to Hatfield; and also had erred in compelling, in any event, the conveyance of said land by deed containing a covenant of general warranty.

Counsel for appellee in his brief says: "We conclude that under the law the whole question in this case turns upon the

single issue, as to whether or not the purchase was made by Allison for Hatfield; if so, the plaintiff must prevail; if not, the dismissal of his bill follows." This is a fair statement of the questions involved in the case. In *Currence* v. *Ward*, 43 W. Va. 367, (syl. pt. 2), it is held: "Where one before a judicial sale agrees to buy in the land in his name for the benefit of the debtor, the debtor to pay the purchase money, and keep the land, it is an express trust, enforceable in equity." And in point 3, it is held, that such trust may be shown by oral evidence. At page 370, it is said in the opinion: "Parol declarations or creations of trust in realty must amount to clear and explicit declarations of trust; loose and indefinite expressions will not do. Hill on Trustees 60." *Troll* v. *Carter*, 15 W. Va. 567; *Armstrong* v. *Bailey*, 43 W. Va. 778.

The claim of plaintiff in this cause is based upon alleged verbal statements and promises made by the defendant Allison, alleging that Allison agreed with plaintiff to "buy in the land" for him. It is conceded by Allison that in a conversation with plaintiff on Saturday before the sale of the land on Monday, plaintiff called Allison's attention to the fact that his land was to be sold on Monday and asked him to buy it; but denied that he asked him to buy it for plaintiff. Plaintiff states in his deposition that he had a conversation with defendant Allison at the ford of Ben Creek in the presence of several parties when Allison said to him: " 'Sanford, I saved your land for you' and I spoke and said 'that is all right Crockett,' and he said 'I will tell you what I had to do, I had to go to F. M. Chafin and go your security on that little note that you owed him and keep him from running up the land on me,' and I says, 'that is all right, I would just as leave pay you the money for it as him,' and that is about all the talk, that is as I remember of it at this time." On cross examination when asked who were present at that conversation he said: "Uncle Jim Hatfield was there and Mr. Peters;" but gave no other names. Plaintiff examined James Hatfield as a witness who being asked by plaintiff's attorney, "Did you at any time ever hear Crockett Allison say anything about having bought in the land where Sanford Hatfield now lives for him? Ans. No, sir, never did." James Hatfield failed to corroborate plaintiff's testimony in regard to said conversation, although present. He seems to have made no further effort to cor-

roborate his statement at that time by any other of the several witnesses who were present at the conversation; did not even examine Mr. Peters whom he remembered to have been present. Plaintiff introduces Ali Hatfield, his father, and Eda Hatfield, his mother, and Martha May, his sister, to prove a conversation between the defendant Allison and Ali Hatfield. First witness, Ali, states that Allison rode up in front of witness' house and wanted witness to take a dram of whiskey, which he did, Allison then asked where the old woman was and he called her out of the house and gave her a dram of whiskey and, then he said "You have heard that me and Sanford is in a law suit have you? and I told him 'Yes,' and he said he didn't want me to think hard of it, and then says that he went and bid Sanford's land in for him, and said 'I am sorry that I ever done it.' " He further said "If he gained the land he aimed to deed half of it to Leander— that is one of my sons—that he would deed him half if he got it, that is all I have to tell." Eda Hatfield stated that the plaintiff was her son and being asked about a conversation between plaintiff and her husband in front of their house said "Well, I went out there, and Crocket he spoke to me and reached me his bottle and I tasted of his whiskey, and he said he reckoned we had heard that him and Sanford was in a law suit, and I told him yes, I had heard it, and he said he didn't want us to think hard of it that he could not help it and that he was forced into it, and I said, 'I didn't get them into it and couldn't get them out,' and he said he went and bid the land in for Sanford and Sanford was lawing him for it, and he said he was sorry he had touched it." And being asked whether anything else was said, answered: "While I was out there he said if he gained the land it wouldn't hurt Leander none, for 'I aim to make him a deed to half of it,' and I went in the house and he talked on a right smart bit after I went in the house to Ali and the rest of them, but I cannot tell what he said after I went in the house." And Martha May was asked about the same conversation, to tell as near as she could what it was: "Well, sir, Crockett Allison come along my Pa's, and we were standing out in the yard, and he asked, 'How are you, Uncle Ali?' and pap said 'Howdy,' and he said 'How are you getting along?' and pap told him he was well and asked him how he was, and he said he was as well as

common, and he asked where Aunt Eda was—that's ma—and he told him she was in the house, and he told her to come out and he reached her his bottle, and he said he guessed they had heard about his law suit and Sanford's, and ma told him yes, they had heard about it, and he told them he didn't want them to think hard of him about it for he was forced into it, that he went to Williamson and bid the land in for Sanford and he was sorry he had ever touched it." And was asked if he said anything what he proposed to do about the land if he gained it, and answered "He said if he gained the land (that is the way he spoke it) that he would make Leander a deed for it and it would not hurt him none and he would have a home for always—that is my other brother. (Q.) That he would make him a deed to all the land? (A.) To his half, he said." This story told by Ali and Eda and Martha is denied by the defendant Allison and bears very evident marks of a manufactured story. Allison is shown to be at least, a fair business man; he is sued to recover from him the land because he had bought it in for Hatfield and was holding it in trust for him, which fact he had denied himself under oath and at that time taking depositions in his defense and it is not at all probable that he would make to them a statement destroying his defense at the very time he was taking evidence to the contrary. He well knew if the fact could be established that he had purchased the land for plaintiff it would utterly destroy his defense. Plaintiff introduced witnesses to prove that he had sold rights-of-way over the land after the purchase by Allison and that he was in possession and control of the same. Soon after the land was purchased by Allison, because of the coal interests in that region, land arose very rapidly in value. At once, after the purchase Allison wrote to defendant McGee, and told him about the purchase and offered him a half interest in the same. This would not look like Allison then regarded himself as occupying a trust relation, proposing to make sale of it. Shortly afterwards McGee came to West Virginia and paid Allison half of the amount paid for the land and took a half interest in the purchase, and after the rise in value, on account of the coal, Allison proposed to McGee that Hatfield, being a poor man, having a large family and an invalid wife, and the surface of the land being of little value to them, they would give and

convey the surface to the plaintiff, to which McGee assented. Allison informed plaintiff of their determination to give him the surface, when he expressed himself as highly pleased. That fact is proved by A. M. Toler who states that he was at Allison's store and Hatfield happened to be there when Allison said to Hatfield: "Say, I don't want your land; it would be no use to me," and said: "Sanford, I will give you your land back and keep the mineral on the land," when Hatfield said: "That was as good as he wanted it; that he had a place now to raise his children; was very well pleased and seemed to enjoy the gift" and says Hatfield did not at that time or at any other time that he knew of, make any claim or pretense that he had gotten Allison to buy in the land for him. Defendant Allison in his answer, as well as in his deposition, states that by reason of the fact that the surface of the land was practically useless and worthless to himself and his co-owner, McGee, considering the condition of plaintiff, determined to give the surface of the land back to Hatfield and that he so informed Hatfield who said "That was a mighty good present; that not many other men would do that." Defendant McGee, in filing his answer refers to that of his co-defendant and adopts it as his own, but states in his deposition taken in May, 1902, that he had never heard, until then, recently, that Hatfield claimed that Allison had purchased the land for him; that, he thought about, probably a year before his deposition was taken, that Hatfield came to Panther to see him about it then, he come to compromise; he said he wanted half the coal; he didn't then claim that Mr. Allison bid it in for him, but wanted half the coal, but after that he said he would take one-third, that is, Crockett one-third, me one-third and him one-third, in the way of compromise; that he had seen Hatfield three or four times between the date of his purchase from Allison and the time that he came to him and wanted part of the coal. F. M. Chafin was examined as a witness in behalf of plaintiff, he stated that he was at the sale made by commissioner Goodykoontz and had Ambrose Lamaster to put in some two bids for him on the property; that he told Allison that Sanford owed him about $40.00 for taxes and he was bidding on it to save his debt; that Allison told him if he would give him time on the debt he would pay it. "I gave him twelve months time and he gave me a note for

mine and I gave him up Sanford's note." Chafin was asked "From this conversation with R. C. Allison did you learn, or get the impressiom that he was bidding the land in for himself or for Sanford Hatfield?" Ans. "I can't recollect, from the conversation, I got the impression some way that he was bidding for Sanford, but I can't recollect whether I got it from Crockett or Sanford." Plaintiff claims that on the 9th day of May, 1901, he gave to defendant Allison, $200.00 which he intended to be applied on the money due from him to Allison on account of the purchase, and filed with the bill a receipt therefor which receipt is dated on the said 9th day of May, 1901: "Received of Sanford Hatfield $200.00 to deposit in the Bank of Williamson for Sanford Hatfield. Signed, R. C. Allison." This receipt on its face clearly indicates that the money was not left to be applied on anything that he owed Allison, but was to be accounted for to him. He explains this receipt by saying that he could not read writing and did not know, until long afterwards, how it read.

Mr. Allison testifies that when Hatfield came to him with the $200.00 he said: "Crockett, I have some money here. I wish you would take it and keep it, for I can't stand to work with this hot vest on." Then he said "Crockett, life is uncertain and death is sure. Give me some paper showing that you have that amount of money of mine." That he wrote the receipt which he read to him just as the agreement was that he should write it; that he sent the money to the bank at Williamson by Howard Toler, who brought back a receipt for the same; that afterwards Hatfield came to him and said "Crockett, I want $8.00 in money for a week, and if I don't pay you back in that length of time you know where it is and you can get it yourself." And he let him have the $8.00. The fact that Hatfield remained in possession and control of the land and negotiated with persons for rights-of-way over the same and exercised acts of ownership over it is entirely consistent with the claim of Allison and McGee, and their action in relation to the same. They had given him the surface of the land and agreed to convey same to him, and of course had no interest in the same, having determined to keep nothing from their purchase but the coal and minerals. The evidence to sustain the plaintiff's claim is not only, not "clear

and unquestionable," as under the authorities it must be, but the preponderance of evidence is against him, the evidence being insufficient to establish the trust claimed by the plaintiff, the decree must be reversed for that reason.    The error assigned because of the decree requiring defendants to convey the land to plaintiff "With covenants of general warranty" is well taken, but it is unnecessary to discuss it here; the bare statement of the proposition is its own answer.

The decree of the circuit court is set aside, reversed and annulled and the plaintiff's bill is dismissed.

*Reversed.*