# CHARLESTON

### HUDKINS *v.* CRIM.

### Submitted March 10, 1908.   Decided March 31, 1908.

1. TRUST—*Evidence to Establish—Verbal Admissions.*

    Oral evidence to establish a trust as to land by oral agreement must be clear, strong and unquestionable. This superior measure of proof is especially required to set up by oral evidence a trust as to land by verbal admission of one since deceased.   (p. 227.)

2. SAME—*Corroboration.*

    Evidence of admissions or declarations by a person to establish against him an express trust for land in favor of another against his legal title, is unreliable and weak, and should be received with great caution, unless corroborated by the circumstances.   (p. 227.)

3. WITNESSES—*Competency—Transactions With Decedent.*

    In the separate estate of a wife the husband has no estate during coverture, as at common law, nor any curtesy initiate. His curtesy vests only upon the wife's death. Therefore, he is a competent witness, though his evidence may go to establish his wife's title.   (p. 233.)

4. SAME.

    The interest in the result of a suit which will exclude a witness under section 23, chapter 130, Code, must be a present, certain, vested interest, not uncertain, remote or contingent, though, if such, it matters not how small the interest.   (p. 233.)

5. SAME—*Impeachment.*

A variant statement made by one in an answer in a former suit, though not between the same parties as in the present suit, may be used to impeach him as a witness. (p. 235.)

6. EVIDENCE—*Pleadings in Another Suit—Admissions.*

An answer by one defendant in a chancery suit cannot bind, or be used against, a co-defendant, either in a former or the present suit, unless the interest of the two parties be joint. (p. 235.)

Appeal from Circuit Court, Barbour County.

Action by Abram A. Hudkins against E. H. Crim and others. Decree for plaintiff, and defendants appeal.

*Reversed.*

W. B. KITTLE and MELVILLE PECK, for appellants.
SAMUEL V. WOODS, for appellee.

BRANNON, JUDGE:

Abram A. Hudkins gave two deeds of trust on a tract of 192 acres of land in Barbour county to secure two debts to J. N. B. Crim. Hudkins was under judgments to other creditors, and Crim brought a creditors' chancery suit against that land to sell the land for the payment of his own and other debts. The land was sold under decree in that case to Crim for $5,285, and the sale was confirmed, and the land was conveyed under decree in the case to Crim. The sale was on the 22d day of October, 1886. Crim died 11th January, 1905. In January, 1906, Abram A. Hudkins brought the chancery suit now in our hands for decision against the executors and devisees of Crim, stating that before the land was sold to Crim under the decree Hudkins and Crim made an agreement by which Crim was to buy the land in his name for the benefit of Hudkins, who was to repay Crim the purchase money with interest and pay taxes, and that it was under such agreement that Crim did buy in the land. The bill of Hudkins thus charged that such agreement created an express trust making Crim but a trustee holding title for Hudkins, and the bill alleging that Hudkins had fully repaid Crim his outlay in the purchase of the land, asked that such trust be executed by a decree requiring the devisees of Crim to convey to Hudkins the said land. The case resulted in a decree in favor of Hudkins. Crim's devisees and executors appeal the case.

This is a case of an oral trust. Not a scratch of a pen appears to show the creation of a trust or to manifest its existence. Under an English statute of frauds known as section 7 of the Statute of Elizabeth, adopted in many of our states, this case could not get into court; but that feature of the statute of frauds has not been enacted in West Virginia, and so oral trusts, though not created or manifested in writing, are enforced in equity in West Virginia. The plaintiff's case rests only on oral evidence. Whilst no writing is required to create or attest such trusts, yet that very fact makes our courts more cautious, more rigid, in enforcing oral trusts based on nothing but oral evidence. The plaintiff's case rests alone on oral evidence of admissions by Crim. No witness states a definite, fixed agreement giving its terms and provisions. The evidence shows only admissions or declarations of Crim, and he in his grave, his lips voiceless to defend the rights of his children. I have long remembered the statement in Starkie's great work on evidence, which I have not been able to find, that of all evidence within the field of evidence such evidence is the weakest and most unreliable. In this case I borrow the language of the eminent and lamented JUDGE SNYDER, on page 11 of 22 W. Va. in *Vangilder* v. *Hoffman*: "The whole claim of the plaintiff rests upon the mere verbal statement of the appellant gathered by witnesses from casual conversations. Evidence consisting of the mere repetition of oral statements—and especially when made to and proved by persons having no interest in the subject of the conversation—is of the weakest and most unreliable character, and should be received with the greatest caution. And unless corroborated by other proof, or aided by surrounding circumstances, it must be held insufficient to establish any material fact." *Horner* v. *Speed*, 2 Pat. & H. 616. "Evidence as to confessions of parties is to be received with great caution, no matter how pure the source from which it is derived, because of the liability of a witness to mistake or misunderstand the admission when made, and to remember inaccurately or misrepresent it afterwards. Such evidence is intrinsically weak, and is inconclusive to establish a fact without the aid of other testimony." *Horner* v. *Speed*, 2 Pat. & H. 616, pt. 4. "Admissions made by a person since deceased, and proved by witnesses who can not be contra-

dicted, are said to be the weakest kind of evidence." 1 Am.
& Eng. Ency. Law, 2d Ed. 723.    "There have been but few
judges or elementary writers, who have not had occasion to
speak of the character of this kind of evidence; such is the
facility with which it may be fabricated, and such the diffi-
culty of disproving it, if false.    It is so easy, too, by the
slightest mistake or failure of recollection, totally to pervert
the meaning of the party and change the effect of his decla-
rations, that all experience in the administration of justice
has proved it to be most dangerous kind of evidence."    1
Ency. Ev. 611, note.    This is just the kind of evidence on
which the plaintiff in this case asks a decree to take away
from a dead man's children a valuable tract of land for which
their father paid thousands of dollars.    This is just the kind
of evidence by which a title to land attested by judicial record
is to be taken away.    The highest evidence of written title,
one by judicial record, is to be torn into tatters to make good
an oral title resting on uncertain word of mouth.    The num-
ber of such suits is legion.    Speaking for myself I would ad-
vise the Legislature to enact the section of the Statute of
Elizabeth requiring a trust to be either created or manifested
in writing in order to protect written title and prevent fraud
and perjury.    In the present case the man against whose
children this trust is alleged is dead, making the demand
for clear proof stronger than if against a living man; but if
Crim were still living our cases and those everywhere demand
that the case be sustained by undubitable evidence.    "Parol
evidence to establish a trust must be clear and unquestionable
to produce such result."    *Armstrong* v. *Bailey*, 43 W. Va.
778, pt. 2.    The same we find in *Hatfield* v. *Allison*, 57 W.
Va. 379.    "The superior measure of proof hereinbefore men-
tioned is requisite in order to establish by parol evidence a
trust in real estate, especially by a verbal admission of a de-
cedent."    17 Cyc. p. 774-5, C.    It is useless to detail the
evidence of the witnesses as to declarations made by Crim.
Taken at best they are uncertain.    And from some of it we
cannot tell whether it relates to an agreement before sale or
to some agreement of purchase after sale.    One of the wit-
nesses only guesses at the land to which Crim referred.    But
were it clearer and stronger than it is, it must fall before
documentary evidence introduced to repel any such trust

whatever. After the sale Abram A. Hudkins remained on the land. Before the sale, but after the deeds of trust to Crim, Abram A. Hudkins sold forty acres of the land to M. J. Hudkins, wife of E. B. Hudkins, and E. B. Hudkins was in possession of the tract along with Abram A. Hudkins for years. Under date of April 15, 1890, Crim delivered to E. B. Hudkins and A. A. Hudkins a memorandum making a claim upon them in the words and figures following: "Rent of farm from October 22, 1886, for five years to October 22, 1891, and all outside of land purchased, $3,048.55. April 15, 1890." Thus Crim claimed that the Hudkinses were not owners but renters of this land in the plainest manner. It has nothing to do with the land purchase. It denies any claim by Hudkins. One of the Hudkinses took this memorandum himself to an attorney, a son-in-law of Crim, and had him to draw a promissory note for the very amount claimed by Crim in his memorandum. "$3,048.55. Philippi, W. Va. April 8, 1890. One day after date we promise to pay to the order of Joseph N. B. Crim Three Thousand and Forty-eight Dollars and 55-100 Dollars at the Tygarts Valley Bank, Philippi, W. Va. Value received. Int. from April 15, 1890. E. B. Hudkins. A. A. Hudkins." In such binding manner did Abram A. Hudkins and his brother, E. B. Hudkins, disavow any ownership by trust or otherwise, and acknowleged themselves to be tenants of Crim. And on the date of that note they executed a deed of trust on cattle to secure to Crim payment of that note.

But that is not all standing as evidence against that trust. In 1902 Abram A. Hudkins and E. B. Hudkins made an option for the sale to the Bijou Coal Company of veins of coal in the land. It seems that Crim took exception to this, else we cannot otherwise explain the fact that the Hudkinses gave Crim the following writing: "Philippi, W. Va., May 13th, 1902. We the undersigned gave to Edward Thompson, of Clarksburg, W. Va., an option of the Pittsburg and Sewickley veins of coal, on the 5th day of March, 1902, at $80 per acre for one hundred acres of the farm upon which we live to run for 90 days, when we optioned said land we supposed J. N. B. Crim would approve the option, as he had told E. B. Hudkins he would let the coal go at the price the other men on the Elk side would sell at. Of course we know the

option would have to be approved by Crim or no sale; also the same is true of the options for oil, gas, &c, as said farm of 192 acres belongs to J. N. B. Crim and we are renters of said farm since his purchase in October or November 1886 and have lived ever since on same land. Crim purchased said land of M. Peck, Special Commissioner, &c. (Signed) E. B. Hudkins, A. A. Hudkins." Here they again acknowledge Crim's ownership, and that they were but his tenants. In January, 1903, Abram A. Hudkins wrote a letter to the attorney for the Bijou Coal Company saying: "The title to the coal we optioned to the *Bijou* Coal Company, you will get from J. N. B. Crim, of Philippi. We only optioned it as agents for him. We sent your letters to him last week. You write him or see him in Philippi." Here again is a flat acknowledgment of Crim's ownership and that the Hudkinses only acted as his agents, subject to his ratification, as shown also in that statement above given. The attorney for Hudkins says that Crim while living never denied the trust; but did he ever admit it? We do not see how it can be said that he never denied it when his acts tell us in the strongest way that he did deny the trust, else why did he render an account for rent and take the note and deed of trust for it? And why did he demand the statement above that he was owner of the land after he heard of the coal option made by the Hudkinses? Why, when Harrison as attorney for the coal company went to Crim to get him to ratify the option, Crim refused to do so, declaring that he was owner of the land, and that he had taken from the Hudkinses the above paper acknowledging his right. He told Harrison, as a contract of his own, that he would take the same price as in the option; but refused to recognize the option made by the Hudkinses.

The above is not all standing in the way of the trust. On the 10th day of September, 1900, Crim and Abram A. Hudkins and his wife conveyed to W. C. Snow coal in eight and a fraction acres of this land. It is fair to say that Abram A. Hudkins joined in this deed only to pass his wife's dower. This deed contains this clause: "The party of the first part, J. N. B. Crim, further covenants that he is seized of an estate in fee simple in said land, and that he has good right to convey the same." Now, if Crim did not own the land, why

this direct statement that he was seized of an estate in fee simple? Hudkins thus acknowledged that fact. This, if not so strong in itself, confirms the other documents above given.

Crim conveyed the coal in this land to the Bijou Coal Company under contract made by himself with it by deed dated 28th February, 1903, conveying it only subject to the contingent dower of the wife of Abram A. Hudkins. This is a direct assertion of ownership by Crim. He would hardly warrant generally if Abram A. Hudkins had the full trust ownership in the land. So Crim utterly denied such trust and dealt with the property as his own. Abram A. Hudkins knew of this sale and conveyance, but made no demand on Crim, and never sued until after his death. In this connection I will state that Hudkins' bill says he never suspected that Crim would deny a trust until February 24, 1903. This was four days before Crim conveyed the coal. Why, then, did he not enforce his trust after his suspicion had been aroused? E. B. Hudkins says that a year later, in the spring of 1904, Crim expressed a willingness to make a deed to his brother. Why did he not get Crim to make such a deed? Why delay if there was a trust? In connection with such assertion of ownership by Crim we find him paying Heatherly $75 for sawing timber from the land in March 1903.

Hudkins claims that he repaid Crim the cost of his purchase. Not a single receipt is shown though the amount was large, $5,285, besides interest. Such repayment is highly improbable, or rather impossible, when we reflect that Abram A. Hudkins before the land was sold was under a load of debt which the sale did not discharge, but left unpaid a debt owned by Crim, which really went with the rent of the farm to make up the promissory note of $3,048.55, besides other debts owing to others. The total of his debts seem to have been upwards of $16,000. Abram A. Hudkins had no other estate. Where in the world, in his deep insolvency, did he get the money to pay that large debt to Crim with its interest?

The documents above repel all idea of trust, and if it exist, the insolvency of Abram A. Hudkins repels the allegation of payment. But in addition to the above documentary evidence denying any trust we have the distinct evidence of

Peck and E. H. Crim, executors of J. N. B. Crim, that after the latter's death Abram A. Hudkins and E. B. Hudkins, both debtors under the deed of trust for $3,048.55, had frequently talked with said executors about that debt, when E. B. Hudkins in the presence of Abram A. Hudkins acknowledged that debt, but complained of it because of eight per cent interest on Crim's outlay for the farm as rent, and E. H. Crim proposed to sell them the farm at $5,500 and they said they would take the matter into consideration, and talked as though they would buy the farm. The Hudkinses did not mention any trust to the executors. These executors are son and son-in-law of Crim and interested, whilst most of the witnesses for Hudkins are his brother and other relatives; but the difference is that Peck and Crim as witnesses are corroborated by the above mentioned written evidence, whilst the witnesses giving declarations of J. N. B. Crim to support a trust, are contradicted by those documents. One witness has a $1,500 debt in suit, which will be good, if Hudkins succeeds. His evidence is next strong to that of E. B. Hudkins.

It goes further to repel the idea of a trust that it is not claimed that Abram A. Hudkins ever paid a dollar to the commissioner who sold the land under the decree. If it could be said that any money was paid, we could plausibly explain the payments by applying them on the debt of $3,048.55. As above said not a single receipt attests those payments. Strange this is in so important a matter. In this connection there is another thing of telling force. Peck as a witness was asked by counsel for Hudkins whether J. N. B. Crim had not for years before his death kept a daily record of money collected from debtors, and whether such record was in the possession of his executors. Peck answered that Crim had kept such record as far back as 1888. Counsel for Hudkins did not ask Peck to produce that record. If it showed payment by Hudkins and on what account, why did not Hudkins call for it?

Let us reflect that Abram A. Hudkins took no steps to enforce the trust which he now so late asserts for nearly twenty years, and then not until Crim was in his grave. Being in possession I do not say that time would bar him under the doctrine of *laches;* but is not this great delay strong to nega-

tive the existance of a trust? Why would Abram A. Hudkins let his very home hang on the slender thread of Crim's life for so many years, if really there was a trust and he had repaid Crim?

The brother of the plaintiff, E. B. Hudkins, is a very prominent witness for the plaintiff, giving in evidence declarations or admissions of Crim that he had bought the land in trust for Abram A. Hudkins. He is the chief witness for his brother. Eliminate his evidence and we have practically nothing left to show the existence of such trust. Counsel for Crim's estate say that he is incompetent to give evidence of conversations and transactions with Crim, now dead, under chapter 130, section 23, of the Code. We cannot so hold. He is not a party, and so we do not have to say whether, if a party, that fact alone would exclude him regardless of any interest. Speaking for myself I do not think so, because under the common law excluding a party as a witness, which has been abolished by the Code with certain exceptions specified in section 23, the party must have an interest in the result of the suit to be promoted by his evidence. 13 Encyclopedic Dig. 906. Has E. B. Hudkins any interest in the result of this suit? It does not involve a deed of trust in which he is a joint debtor. He would not get any of the land by success of the plaintiff in this suit. It is true that Abram A. Hudkins had, before the sale to Crim of the land under the decree, but after Crim's two deeds of trust for which the sale was made, sold to the wife of E. B. Hudkins forty acres of the land, and thence it might be claimed that E. B. Hudkins had an actual interest; but he had none. Why? It was his wife's separate estate and he had no estate *ex jure mariti*, that is, to hold the land during marriage, as the separate estate act abolished that estate in the husband, and he has no curtesy initiate as at common law, as the separate estate act changes this, and a husband relict has no curtesy until after his wife's death in his wife's separate real estate. *Guernsey v. Lazear*, 51 W. Va. 328. His curtesy is only contingent upon his wife's death before his death. And to exclude a witness for interest that interest is tested by common law and must be present, certain, vested interest, not an interest uncertain, remote or contingent. 13 Encyclopedic Dig 937; 1 Greenleaf Ev., sec. 386; 3 Jones on Ev., sec. 744.

True, we may say that the home of E. B. Hudkins is involved, but that is not such vested estate or interest in the very land as would exclude him. But though interest does not exclude him, yet his relation to his wife and to his brother bear heavily upon his credit as a witness. And there are certain circumstances in this case which must annihilate his evidence and deprive it of all force in the case. He swore in this case that the note for $3,048.55 and the deed of trust given by himself and his brother Abram were based on no consideration, based on no real debt, represented nothing. He swore in this case that Crim purchased at the court sale for the benefit of his brother Abram A. Hudkins, and that Crim told him so. In 1890 Emmett I. Hudkins brought a suit against E. B. Hudkins and Abram A. Hudkins, J. N. B. Crim and others alleging that the deed of trust made by E. B. Hudkins and Abram A. Hudkins on cattle to secure Crim said debt of $3,048.55 was fraudulent, and charging that Crim purchased the 192 acres in controversy in this suit for the benefit of Abram A. Hudkins, and seeking to subject said stock and land to an indebtedness of Abram A. Hudkins in favor of Emmett I. Hudkins. In that suit Abram A. Hudkins, E. B. Hudkins and J. N. B. Crim filed separate answers. The answers of E. B. Hudkins and Crim are found in the papers of that case, but the answer of Abram A. Hudkins is gone therefrom and cannot be found on search. The answer of E. B. Hudkins, sworn to by him, flatly asserts that the debt of $3,048.55, secured to Crim by said deed of trust, was subject to a credit of $795, and that the residue was unpaid and was a *bona fide* debt to Crim, and that the deed of trust for it was *bona fide*. That answer contained this further clause: "It is not true that the A. A. Hudkins land, was purchased by respondent, or for him, nor has he any interest therein, except as he leases it, from the owners." There is no claim in the bill that Crim purchased for E. B. Hudkins; but it charged that the purchase was for A. A. Hudkins. So this clause in E. B. Hudkins' answer was intended to deny that charge. This statement in that answer being in such deadly contradiction to the evidence of E. B. Hudkins in the present case, he was asked if he had filed that answer, and strange to say, though appearing to be an intelligent witness, fluent and discursive and very recollectful in his long deposition of nu-

merous matters in long gone time, and very minute in his
details, so much so as to arouse suspicion, yet he said that he
had forgotten that he was a party to that suit of Emmett I.
Hudkins, and had forgotten that he had filed an answer, and
had forgotten that he had sworn to it before Hovatter, a
notary, and had forgotten that in the answer he said that he
was but a renter of the land, and had forgotten the note for
$3,048.55, and had forgotten that he had paid $795 on it, and
he had forgotten the deed of trust for that note.   He now
says that that note and deed of trust had no consideration,
whereas his answer said it was a just debt; and he now swears
that Crim bought the land for the benefit of Abram A. Hud-
kins, whereas in that answer he said under oath that Crim had
not bought it for the benefit of his brother, and that his
brother was a renter of the land.   Here a certain principle
touching credit of witnesses applies, and in tenderness it is
best to put in it Latin.   "*Falsus in uno Falsus in ominbus.*"
In which instance is he telling the truth?   What court can
answer this question?   As JUDGE JOHNSON said on page 626
of 29 W. Va. in *Machine Co.* v. *Dunbar*, if ever that maxim
applies it applies in this case.   A court cannot act on his evi-
dence in this case when under oath on a former occasion this
witness made statements flatly contradictory to his evidence
in this case as to the same vital points on which this case rests.
This answer is admissible evidence to contradict his evidence.
*Wilson* v. *Phoenix Powder Co.*, 40 W. Va. 414; *Hunter* v.
*Jones*, 6 Ran. 541, Anno. also.   "Variant statements made
by a witness under oath, though not in the form of testimony
may also be used to impeach."   7 Ency. of Ev. 58.   On page
60 we find this:   "A statement made by one under oath may
be proved as a variant statement to impeach him."

It is claimed in this case that this answer of E. B. Hudkins
binds Abram A. Hudkins as if it were his own answer.   This
theory is based on the law that the answer of one defendant,
as to its statement of facts, is binding on his co-defendant where
they have a joint interest as stated in *Dickinson* v. *Clark*, 5
W. Va. 280, pt. 3, and 10 Cyc. 981, and 4 Elliot on Ev., sec.
3206, and 1 Am. & Eng. Ency. L. (2d Ed.) 703, 720.   But
it does not appear how E. B. Hudkins and Abram A. Hud-
kins have any joint interest in this land, and we are not told
wherein this joint interest exists.

As above said, the answer of Abram A. Hudkins is not found in the papers of the Emmett I. Hudkins suit; but Melville Peck states that both answers were of like "tenor and effect."'' If so, that would bind Abram A. Hudkins to the statement of the answer of E. B. Hudkins; but Peck was the counsel who filed the answer of Abram A. Hudkins, and his evidence to prove that said answer was the same as that of E. B. Hudkins is not admissible, because of the sacredness of the relation of attorney and client forbidding an attorney to reveal privileged communications made ·by client to him, from a high public policy. Necessarily the facts about such purchase of the land by Crim as stated in the answer must have been imparted to Peck by Abram A. Hudkins. He could get them no where else, and those facts he cannot state. It makes no difference that, as suggested by counsel, those facts appeared in the answer. We know what facts appeared in E. B. Hudkins' answer, but not what appeared ·in the answer of Abram A. Hudkins except as to this evidence of Peck as to its tenor and effect.

Abram A. Hudkins is silent as a witness in this case. His non-appearance may be excused because by law he could not give evidence as to any conversation or transaction with Crim in his life time; but there are certain matters of importance in this case as to which he would be a competent and very important witness. He could have disputed the testimony of E. H. Crim and Melville Peck about his conversation with them, after the death of J. N. B. Crim, in which they say that he told them he was a renter of the farm and was to pay rent at eight per cent on what Crim had paid for the farm, and that if Crim had lived he would not have charged him that much interest and wherein they said he talked about buying from them. This statement that he was a renter and was negotiating for the purchase of the farm from Crim's devisees is very important and the failure of Abram A. Hudkins to take the stand as to those statements applies the rule of law where evidence is in the possession of a party and he does not produce it the omission tells against him. Especially is this the case where one witness asserts a conversation with another material in the case, and he fails to deny it. This makes us hesitate to believe that he was willing to go on oath to deny this matter.

We hold that no trust is established; but if even there ever was a trust the evidence of E. B. Hudkins would show that the purchase by Crim under such trust was to hide away the land from the many creditors of Abram A. Hudkins and shield it from their pursuit, and thus hinder, delay and de-fraud creditors. And in such case it is very well estab-lished that Abram A. Hudkins could not enforce the trust, he being an active participant in the fraud, and equity would leave the parties without relief, where they placed them-selves. *McClintoc* v. *Loisseau*, 31 W. Va. 865; *Stout* v. *Philippi M. & M. Co.*, 41 *Id.* 339, pt. 7.

Reliance is placed for the plaintiff on *Currence* v. *Ward*, 43 W. Va. 367; but the cases are vitally different in fact. In that case the evidence clearly established the agreement of Wards to buy for Currence at the sale. Wards agreed that after the sale they did tell Currence if he would pay the cost of the land he might have the land. In that case Currence paid the commissioner the cash payment, and other pay-ments to a large sum. Here Hudkins paid nothing to the commissioner. The Wards seemed not to deny the agree-ment, but claimed that as the land was resold for Currence's failure to pay, the trust ended. Currence paid in fifteen months after paying the commissioner $1,305.70. The cases, in their facts, are widely dissimilar.

For these reasons we reverse the decree and dismiss the bill.

*Reversed.*