**Clara Damron BRENNAN, Plaintiff,**

v.

**Eileen Damron KEMP, Defendant.**

**Civ. A. No. 695.**

United States District Court,
S. D. West Virginia,
Huntington Division.

March 31, 1955.

John E. Jenkins, Jr., and Jenkins & Jenkins, Huntington, W. Va., for plaintiff.

Philip A. Baer, Milton J. Ferguson, and Hammack, Ferguson & Baer, Huntington, W. Va., for defendant.

WATKINS, District Judge.

Plaintiff and defendant are sisters. Their father, A. W. Damron, conveyed a parcel of real estate to the defendant in 1945, reserving a life estate for himself. The deed did not mention the plaintiff, who now claims that there was an

oral trust agreement between her father and sister at the time of the conveyance, whereby she was to get an undivided one-half interest in the remainder. The property was sold in 1951, and plaintiff now seeks to impress the proceeds received by her sister with such trust. The only question is whether plaintiff has established such oral trust agreement. The father was unable to come to court because of poor health, but his deposition was taken. The only other witnesses to testify were the two sisters, whose testimony was in sharp conflict. But the conflict in testimony did not end there, because the recollection of the father differed with the recollection of each daughter as to material facts. Both sisters waived a trial by jury and the case was submitted to the court to decide the facts and the law. After observing the witnesses testify, their demeanor on the witness stand, and considering the conflicting testimony, I make the following findings of fact and conclusions of law:

### Findings of Fact.

The wife of A. W. Damron died in 1937, whereupon Damron asked his daughter, the defendant, to move from Charleston, W. Va., where she was then residing, to Huntington, W. Va., and keep house for him. The defendant and her husband moved to Huntington as requested, and occupied the house in question where the father was living. Damron said that the arrangement was that the defendant was to "move in and take charge of the house, housekeep, cook and everything that you would expect a wife to do." The other daughter, the plaintiff, was employed, resided in Florida, and there had been an estrangement between her and her father, although she did come to Huntington to attend her mother's funeral. Defendant assumed full responsibility for the management and maintenance of the home, doing the cooking and cleaning, collecting the rent for a third floor apartment and using the rental as she deemed proper. She was then married to one Ramsey and they had one daughter. About three months after they moved there, they separated and were subsequently divorced. For the next fourteen years defendant and her father lived in the property under this arrangement until the property was sold in April, 1951.

In 1943, with the approval of her father, and at her own expense in the sum of $15,000, the defendant converted the property into three furnished rental units and living quarters for herself, her daughter and father. Bills were produced at the trial for inspection. Her husband gave her $1,000 of this money at the beginning, and for three years thereafter she received $200 per month as her allotment while he was overseas in the service, which she applied to the property. The balance of the money came from money which she borrowed and rents which she collected. Neither the father nor the plaintiff advanced any of the money for converting the residence into the apartments or to pay back the borrowed money. Plaintiff contends that she sent her sister $20 each two weeks for a period of five years to apply on the loan but was unable to produce a single cancelled check, check stub, letter, receipt, or anything else to corroborate her statement. Defendant denied that plaintiff had sent her any money for this purpose.

The day before Christmas in 1945, the father delivered to defendant a deed conveying the property to her with covenants of general warranty but excepting and reserving unto himself a life estate in the property. The defendant assumed the payment of the indebtedness against the property as shown in the deed amounting to $4,276.61. At that time the father, an accountant, was 65 years of age, in good health, and active both physically and mentally. In 1952 he had a stroke and about six weeks before this trial suffered another stroke.

Prior to the transfer of the property to defendant, and before the house was converted into apartments, the father had it listed with a real estate agent for sale at approximately $7,800. During the fourteen-year period (1937–1954)

that defendant and her father lived in the property, the management of it was left entirely to the defendant. She received all the rents and profits and paid for the conversion of the property, repairs, and unkeep of same. Her father paid half of the taxes and utilities and the defendant paid the other half.

By deed dated April 12, 1951, the defendant and her father sold the property for $27,000. Out of the purchase price the father received $5,000, which was the amount he requested for his life estate. The sum of $7,158.13 of the purchase price was paid to release a lien on the property, the sum of $1,350 was paid to the real estate agent, and the defendant received a promissory note in the amount of $3,500 secured by a deed of trust on the property. The balance of the purchase price of $9,991.87 was paid to the defendant in cash. These figures show that the defendant has obtained little, if anything, more than she had invested in the property. They also show that at the time the property was transferred to her that she paid a reasonably adequate consideration for the conveyance. It was transferred to her subject to the life estate of her father and subject to the outstanding deed of trust lien. She had put $1,000 obtained from her husband into the property and had put $7,200 obtained from her service allotment, or a total of $8,200 into the property. With the approval of her father she took complete charge of the conversion of the real estate, furnishing of the apartments, the rental and collection of rents, the borrowing of the money, and payment of indebtedness, without compensation therefor. She had also rendered valuable services to her father in keeping house for him over a period of years, during part of which time she worked as cashier at a prominent Huntington hotel and worked for the government in Huntington as a clerk, did sewing and alterations for others as well as making draperies. With consent of her father the proceeds were put into a common fund with the rent to pay expenses, including the cost of sending her daughter to school. The other daughter, the plaintiff, returned to Huntington only once between 1937 when the mother died and 1952, when the wedding occurred. This was in 1943 for a few days.

In December, 1952, about one and one-half years after the property was sold, and the deed of trust lien paid, and the proceeds distributed by the father and defendant in accordance with their respective interests, and without any disagreement between them as to the proper distribution of the proceeds of sale, the plaintiff came to Huntington from New York to attend the wedding of defendant's daughter. At that time plaintiff requested some of the money from the sale of the property. She did not specify what interest she claimed but later brought this suit in which she claims that at the time of the transfer of the real estate there was an oral trust agreement between defendant and her father by which she was to get an undivided one-half interest in the real estate subject to the life estate of her father. In her action she seeks to establish an oral trust in one-half of the net proceeds of sale.

At the trial she testified that her father and defendant had talked to her on the telephone some eight or nine times between 1937 and 1943, in which they had discussed the fact that the father and the two daughters were to share equally in the property, later stating that this occurred ten to twelve times. In response to questions by the court she stated that the understanding between the three of them from 1937 to 1943 was that each was to own one-third of the real estate. Defendant said that the matter was never mentioned in conversations with her sister, and that she did not know that her sister claimed any interest in the proceeds of the property until the wedding in 1952. Defendant said that she had told her sister a short time before the sale in 1951 that they intended to sell the property, but her sister never claimed any interest. Plaintiff claims that she did not know of the transfer to her sister until 1952. The

father also denied the statement of the plaintiff to the effect that between 1937 and 1943 there had been many discussions between plaintiff and him about the equal division of the property. He testified that prior to the transfer of the property to his daughter in 1945, he had at no time discussed such matter with plaintiff. At two other places in her testimony plaintiff said that her father told her that the property would be divided equally between her and her sister. At another place in her testimony she stated that all her father said was that "the property would be divided between Mrs. Kemp and myself if something happened to him." At another place in her testimony she said the understanding was that if her father sold the property he would make a gift of money to the daughters. She testified that between 1943 and 1948 she sent $20 every two weeks to her sister as her half of the mortgage payment on property, whereas her father testified that he kept up the mortgage payments on the property until December, 1945, when the property was transferred to defendant. It is clear that plaintiff was wholly confused at the time of the trial as to her own understanding of the interest which she claimed in the property conveyed to her sister, and it is impossible for the court to arrive at any clear understanding of her claim. Plaintiff's testimony is in direct conflict in many material respects with that of her father who is her principal witness. The evidence of the father conflicts in many material respects with that of each of his daughters.

It is impossible to determine from such conflicting evidence what the parties understood, agreed to, or expected, if anything. The conduct of the parties both before and after the transfer of the property to the defendant supports defendant's theory of the case. There is no reliable evidence in the record to indicate that the defendant ever by word or act treated this property as trust property, or in any manner except as the owner of it. The actions and conduct of the father are to the same effect. The evidence shows that after she received a deed for the property, for which she gave adequate consideration, she assumed all the incidents of ownership. She rented the property, collected and used the rents, borrowed money on it, and finally sold it, and distributed the proceeds, all with the knowledge and approval of the father.

On November 6, 1953, the deposition of the father was taken because of his ill health. His testimony as to what, if any, understanding he had with the defendant as to a division of the proceeds is somewhat vague and uncertain. The substance of his testimony is to the effect that at the time the deed was delivered, nothing was said by him with reference to a division of the proceeds, but that some time prior thereto defendant had stated that she would take care of plaintiff. He testified that at no time did defendant say anything about dividing the property or proceeds of sale equally with plaintiff, and that the only thing she said was that "she would take care of Eileen" (plaintiff); that nothing was discussed about dividing the property when the deed was delivered in 1945; that it had been mentioned "beforehand" that plaintiff was to share in the proceeds, but to what extent she would share was not discussed. He testified that defendant had previously told him "I will take care of Eileen", and then added, "That is about the extent of her account of her obligation"; that he continued to live with defendant after the transfer in 1945 until the property was sold in 1951; that at no time during this period or at the time the property was sold and the proceeds of the money distributed did he mention to defendant anything about dividing up the proceeds of sale with the plaintiff; that out of the $5,000 he received from the sale he gave the plaintiff $500; that after the transfer in 1945, defendant made no accounting to him or anyone else as to the rents received, and that he exercised no control over the property after he gave her the deed. He testified that he paid the grocery bills, but this is denied by

defendant who testified that her father earned $50 per week from his employment as an accountant for a Huntington hospital, plus some additional compensation occasionally when he did special work for a hospital in Logan, W. Va. Defendant testified that after the conveyance to her he paid one-half of the taxes and utilities and used the balance of the money as he desired. She denied that he paid her $20 per week for taking care of his room, or that he paid the grocery bills, as testified by him. He said that after the property was transferred to his daughter it enhanced a great deal in value, due more to the general trend in increased property values than to the money spent to convert it into apartments. He was not certain as to why he did not mention plaintiff in the deed, but his only conclusion in 1953 when giving his recollection of the facts was that if she was named in the deed defendant would have to send it to New York for her to sign when she wanted to borrow money on the property. The father did make it clear when he testified in November, 1953, that he then felt that he had made a mistake, and that he wished that he had acted differently in 1945. However, as late as 1951, when the property was sold, he could have secured to his daughter in New York the interest he later stated he intended for her. He could have prevented a sale as late as 1951 by refusing to sign a deed until there was a definite understanding concerning the plaintiff's share. It is reasonable to infer that his conduct during all these years indicates that it was never his intention to convey the property to the defendant, or any part thereof, in trust for the plaintiff. Had the defendant known of any claim of plaintiff to the property, and if she had desired to deprive the plaintiff of such interest, the defendant could have waited until the father died and then there could have been no question as to her absolute title. It is quite clear that defendant never considered that the property was impressed with a trust.

The evidence shows first, that the property was conveyed to the defendant for a valuable consideration, just as the deed recites; second, that the defendant did not take title to the property subject to an oral express trust as claimed by the plaintiff; and third, that plaintiff has failed to prove the oral trust claimed by her.

### Conclusions of Law.

There is no conflict between the parties as to the law of the case. It is admitted that West Virginia recognizes a parol express trust in real estate. Such a trust springs from the agreement of the parties. The parol agreement relied upon must be certain and definite in its terms. The declaration of trust must be unequivocal and explicit and established by clear and convincing evidence. The parol trust must be created before the trustee obtains legal title, for if the agreement is subsequent, it will fall under the provisions of the statute of frauds requiring the transfer or sale of the lands to be in writing. Smith v. Turley, 32 W.Va. 14, 9 S.E. 46; Currence v. Ward, 43 W.Va. 367, 27 S.E. 329; W.Va.Code, sec. 3523 [36–1–3].

Defendant denies that she stated that she "would take care of Eileen", but, if she did make such statement it would not constitute a declaration of trust. The evidence falls short of the requirement that oral evidence to establish an express trust must be clear and convincing. Hatfield v. Allison, 57 W.Va. 374, 50 S.E. 729; Newhouse v. England, 118 W.Va. 649, 191 S.E. 525.

For the reasons stated, a judgment may be entered for the defendant.